## CHARLES CARPENTER v. JAMES MONKS.

*Boundary lines—Survey—Ancient fences—Adverse possession—Color of title.*

1. It will not do to permit boundaries to be disturbed and moved upon a survey made from an assumed starting point, without some proof of its being a true line, located and fixed by the original survey.

2. The only practical way of ascertaining the true line is by a survey made from some fixed starting point,—some monument placed under the original government survey,—and, if such monuments are no longer discoverable, the question is, where were they located? And fences of long standing, erected upon what parties have called the "true line," and up to which they have improved and cultivated, are better evidence of the true line than surveys made after the monuments have disappeared; citing *Diehl v. Zanger*, 39 Mich. 605; *Beaubien v. Kellogg*, 69 Id. 333.

3. A grantee, at the time of taking possession of a parcel of land described in his deed, extended such possession so as to include in the same inclosure a piece of land which, according to the line as then located, was also covered by said deed, which possession he continued to exercise adversely over the *whole* land for the statutory period. The adjoining land-owner brought ejectment, claiming that the line was wrongly located, and that the second parcel was not included in the description in the defendant's deed; and it is held that the defendant need not show paper title to the disputed parcel in order to show adverse possession; that he entered into possession under color of title to the other parcel, with which the disputed parcel was inclosed, which gave him color of title to the *whole* land.

Error to Jackson. (Peck, J.) Argued May 9, 1890. Decided May 16, 1890.

Ejectment. Defendant brings error. Reversed. The facts are stated in the opinion.

*Richard Price* (*Thomas A. Wilson,* of counsel), for appellant, contended for the doctrine stated in the opinion.

*Barkworth & Cobb,* for plaintiff, contended:

1. Unless the land in question was within the general description owned by defendant, then defendant had no paper title thereto, and his possession, and that of his grantor, was originally a mere trespass. In *Simpson v. Downing*, 23 Wend. 316, the court held that a deed, or some writing sufficient in form to carry title to land, is an essential ingredient in a constructive possession set up as a bar to a recovery in an action of ejectment; and in *La Frombois v. Jackson*, 8 Cow. 589, the court said: "To give color of title, the instrument of conveyance must be good in point of form, profess to convey the entire title, and be properly executed." A conflict seems to exist, arising from the interchangeable use of the terms "color" and "claim" of title, which, as a matter of fact, exist separate and independent of each other. Although in a few instances documentary evidence is not required to support a claim under color of title, the decided weight of authority and opinion is that a written instrument is necessary, so far good in appearance as to be consistent with the idea of good faith, and purporting on its face to convey title; citing Warv. Abst. 520;

*Baker v. Swan*, 32 Md. 355; *Kruse v. Wilson*, 79 Ill. 240; *Stark v. Starr*, 1 Sawyer, 20; *Gittens v. Lowry*, 15 Ga. 338.
2. Adverse possession is a defense resting wholly upon facts; citing *Demill v. Moffat*, 45 Mich. 410.

LONG, J. The defendant is the owner in fee, and in the actual possession and occupancy, of the S. part of the E. ½ of the S. E. ¼ of section 6, town 3 S., of range 1 E., Jackson county, containing 37 acres, more or less. He derived his title from Mr. Gunnison in August, 1868, and the same fall put up a barn on the premises, and lived in it for a time. Subsequently he built a house, and has continuously lived upon the land.

At the time of his purchase the west boundary of his land had been located under a survey made by one Dr. Mitchell. At this time Mr. Feldshaw owned the E. part of the W. ½ of the S. E. ¼ of the section. The Feldshaw land at this time was heavy timbered and unoccupied, and continued unoccupied up to about the year 1886. Before the defendant's purchase his grantor, Mr. Gunnison, took the timber off the land up to what was supposed to be the Feldshaw line. The next spring after the defendant went into possession he cleared off a portion of his land in the south-west corner, and built a fence on what he supposed to be the line between him and Feldshaw, running north about 20 rods, and also dug a ditch along that line, commencing at the north-west corner of his land, running south to what was then a swamp. He also erected a fence along the line of this ditch towards the south. This left a small portion of the line unfenced on account of the swamp, up to within a few years ago, when a fence was built connecting through; but the timber was cut along what was called the "true line," and the defendant has used the land east of this line in connection with the balance of his farm, cultivating some and pasturing the remainder.

It appears that before the defendant's purchase, and while the title was in a Mr. Bliss, the grantor of Gunnison, he caused a survey to be made to ascertain this boundary. It was made by Dr. Mitchell, a surveyor. Dr. Mitchell testifies that he made the survey about 20 years prior to 1888, that is, about the year 1868, and at that time found the trees and the original corner stake at the south-east corner of the section; that he measured the section line west from this stake to the quarter post, and at a point equidistant between the two marked the fence extending along the line of the railroad on the south. This was called the "defendant's west line." From this mark on the fence the trees were blazed through, towards the north, on what was then supposed to be the line, and defendant claims to have kept and maintained his fence in accordance with this mark on the railroad fence, and as the trees were blazed.

The plaintiff purchased the E. part of the W. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$ of this section on April 13, 1886. It was then wild and uncultivated. In June or July, 1887, plaintiff caused a survey to be made to ascertain the true boundary line between these two pieces of land, and now claims that by such survey the defendant is occupying a strip of land embraced in the description of his land a little over 2 rods in width at the south end, and about 9 links in width at the north end, containing 55–100 acres of land. This is an action of ejectment to recover this strip. On the trial plaintiff had verdict and judgment. Defendant brings error.

The only questions are raised upon the charge of the court, and the refusal to give certain of defendant's requests to charge. The plaintiff, to maintain his case, called certain surveyors, who testified to surveys made by them to ascertain the true boundary. Mr. Charles B. Hyde, a civil engineer and surveyor, made a survey in

June or July, 1887, at the request of plaintiff. He says he did not set the center post, but found the one set by Mr. Bean, another surveyor, and that the accuracy of his survey depends upon the accuracy of that of Mr. Bean. Mr. Bean was also called by the plaintiff, and testified that he was a civil engineer and surveyor, and about two years ago he established fire-clay posts in that vicinity. The witness then says:

"There was no difficulty with any corner except the south-east corner, which I had assisted Mr. Cook some twelve or fifteen years before in finding; that is, we found witnesses for that corner, and re-established it, and. my fire-clay post was put where the post was put at that time."

On his cross-examination, the witness says:

"The difficulty referred to with the south-east corner was that the corner was gone, and I assisted Mr. Cook in hunting it up for our own convenience. We found the old witness stump, and located the corner by the witness. They never succeeded in finding the corner before, or finding even a trace of the witness. Mr. Cook was county surveyor at the time, and I was called to help him hunt up the corner. The way we located it was, we measured from. the four corners east and west, north and south, and also run the lines to approximate at the point of the original corners as near as we could from the other lines; then, assuming that point, we laid off an angle, and went to digging for the witness, found the witness, and located the corner with reference to it. We found nothing of the old government corner. It was in the road, and had been plowed up and cultivated. * * * The witness in this case was a white oak stump. It was rotten some, of course, but still there was no trouble in determining it. There was a portion of the stump left,—most of it. It was not a large tree originally. There was nothing of this stump above ground. Most of the stump was remaining; the root of it, and a portion of the stump. The base of it was under ground. I don't remember how far we dug before we found it. It is not impossible that we may have. made a mistake."

This is substantially all the evidence offered on the part

of the plaintiff showing the true boundary line between his land and that of the defendant.

The defendant requested the court to charge the jury as follows:

"If you find that the survey made by Dr. Mitchell of the line in controversy was the correct survey, and that defendant's fence between him and plaintiff corresponds with this survey, your verdict must be for the defendant."

This the court refused, and charged the jury upon that branch of the case as follows:

"If you should find that the disputed premises for the recovery of the possession of which this action is brought were within the description of Monks' land, the plaintiff cannot recover without reference to any other considerations in the case. If, on the other hand, you should find from all the evidence that the disputed tract was embraced with and formed a part of the description which belonged to Mr. Carpenter, then you will consider other branches of the case to which I now call your attention."

The refusal to give this request, and this portion of the charge as given, raise the first point discussed by defendant's counsel under their first and second assignments of error. The contention of defendant's counsel is that the question in controversy was not whether this piece of land was included within the description of the land of the defendant, but where is the true west line of such land?

There are two questions involved: If the true line is as claimed by the defendant under the Mitchell survey, then the land in controversy is within the description of the land claimed by the defendant, and, if the true line is as found by the survey made by the plaintiff, then the land in controversy is within the description of the plaintiff's land. The testimony of the surveyors introduced by the plaintiff is quite unsatisfactory as to how the line was found by them. The Mitchell survey was made in 1868, long prior to the other surveys. He testifies that at that

time he found the old section corner at the south-east corner of the section, and that the witness trees and the original corner stake were there then. He also found the quarter post. From this it was an easy matter to find the true dividing line between these lands, and from this corner so found the line seems to have been established before the defendant purchased. On the other hand, Mr. Bean testified that:

"We found nothing of the old government corner; it was in the road, and had been plowed up."

It will not do to permit boundaries to be disturbed and moved upon a survey made from an assumed starting point, without some proof of its being a true line, located and fixed by the original survey. The only practical way of ascertaining the true line is by a survey made from some fixed starting point,—some monument placed under the original government survey,—and, if such monuments are no longer discoverable, the question is, where were they located? And fences of long standing, and erected upon what parties have called the "true line," and up to which they have improved and cultivated, are better evidence of the true line than surveys made after the monuments have disappeared. *Diehl v. Zanger*, 39 Mich. 605; *Beaubien v. Kellogg*, 69 Id. 333.

The jury were left under the charge of the court to determine which of these surveys was to be trusted, and to which the greater weight should be given, and, referring to the testimony of Dr. Mitchell, the court stated:

"If you should find that at the time Dr. Mitchell made the survey he actually found the corner post at the south-east corner of section six; that it was in existence at that time, and he found it,—that would be a circumstance in favor of Dr. Mitchell's survey, and it would be proper for you to consider in connection with determining the fact which of the surveys is more to be trusted."

The court did not call the attention of the jury to the fact in this connection that Mr. Bean testified that he found nothing of the old government corner, and that it was not impossible, as he says, that he may have been mistaken in locating the witness tree. On this branch of the case the jury should have been instructed that, if they believed that Dr. Mitchell found the monument erected by the government survey at the south-east corner of the section, and the dividing lines between these lands was properly fixed by him from the corner post, that was the true line between these lands. According to Mr. Bean's statement, he found no starting point which was known to correspond in any degree with the original government survey. The whole case was submitted to the jury upon the question as to where the true line is, upon an entirely false theory. It was not a question as to how much weight the jury should give to the testimony of this surveyor or that, but did either find a correct starting point from which the line could run? Dr. Mitchell says he did; and Mr. Bean, making his survey some years after, says he found nothing of the old government corner; and Mr. Hyde says his survey depended upon the accuracy of Mr. Bean's. It appears, then, that the accuracy of the survey made by Mr. Hyde in 1887, and under which the plaintiff claims to recover this strip of land, depends upon the survey of Mr. Bean, who does not pretend to have found any known monument. The defendant's request should have been given, and the court should have directed the jury that the plaintiff's evidence fell short of establishing any corner or starting point from which the true line could be ascertained.

This must dispose of the case. But, as the case must be remitted for a retrial, we notice the other question. The court charged the jury, among other things, as fol-' lows:

"If there was no paper to give color of title, then the possession would gain nothing by that color, and it would have to be actual over all the land claimed by it; so that in this case Monks' possession must have been an actual possession, with the characteristics which I have explained as essential to its proper validity, over all the land covered by the declaration and its description."

It is contended by defendant's counsel that a deed or written instrument is not necessary to give color of title, and that the defendant did have color of title to this strip. The characteristics of possession which the court gave to the jury, as entitling the defendant to have this strip, are that—

"It must be hostile or adverse, actual, visible, notorious, exclusive, and continuous for the full period of fifteen years."

It is not disputed that the defendant went into possession of the land described in his deed some time in the year 1868 or 1869, and that he has ever since been in actual, visible, notorious, exclusive, continuous, and adverse possession of such land as against every other person. This suit was commenced February 27, 1888. At the time of taking possession of these lands under his deed, he also took possession of this strip in controversy, and he has exercised the same acts over that as he has over the land described in the deed; and, even if this strip is not included within the description contained in the deed, the deed itself gave color of title in him to this strip. It is not necessary that he have paper title to this strip in order to show his possession. He went into possession under color of title to the other part, and this strip was inclosed with it, which gave him color of title to the whole, and, if his possession of this strip has all of the characteristics of the possession to the balance of the land, 15 years would give the plaintiff

the right of recovery. Whether he has had such possession or not are proper questions of fact for the jury.

The judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.