KAHN-REISS, INC. v DETROIT & NORTHERN SAVINGS & LOAN
ASSOCIATION

1. APPEAL AND ERROR—NON-JURY TRIAL—FINDINGS OF FACT—CLEAR
   ERROR—COURT RULE.
   A trial court's finding of fact in a non-jury trial will not be
   reversed unless the appellate court is convinced that the deter-
   mination was clearly erroneous (GCR 1963, 517.1).

2. EASEMENTS—RIGHTS-OF-WAY—DESCRIPTIONS—EXTRINSIC EVIDENCE
   —PROPERTY INVOLVED—INTEREST INVOLVED.
   A right-of-way which is too indefinite for a determinate descrip-
   tion is too indefinite to be established and protected by the
   court; but if the description in a written document is insuffi-
   cient, other extrinsic evidence may be examined to determine
   the specific property involved, and such factors as the circum-
   stances of possession and ownership, the relation of the parties,
   and their relationship to the property, may be examined to
   determine the description of the interest at issue.

3. EASEMENTS—RIGHT-OF-WAY—APPEAL AND ERROR—CLEAR ERROR—
   EVIDENCE—CONFLICTING TESTIMONY.
   A finding by a trial court that a provision concerning a right-of-
   way in an option-to-purchase agreement was too indefinite to
   receive enforcement is not clearly erroneous where the lan-
   guage of the agreement is ambiguous and the testimony regard-
   ing the intentions of the parties is conflicting.

4. APPEAL AND ERROR—PRESERVING QUESTION—QUESTIONS OF LAW.
   An issue not raised in the trial court is generally precluded from
   appellate review; however, if the question is one of law and all

REFERENCES FOR POINTS IN HEADNOTES
[1, 3, 5, 7] 5 Am Jur 2d, Appeal and Error § 839.
[2] 25 Am Jur 2d, Easements and Licenses §§ 20, 63, 64.
   Locating easement of way created by a grant which does not
   definitely describe its location. 110 ALR 174.
[4] 5 Am Jur 2d, Appeal and Error § 545 et seq.
[5] 25 Am Jur 2d, Easements and Licenses § 24.
[6] 25 Am Jur 2d, Easements and Licenses §§ 33, 37.
[8] 12 Am Jur 2d, Boundaries §§ 55, 61, 71.

of the facts necessary for its resolution have been presented, the Court of Appeals may review the claim.

5. EASEMENTS—IMPLIED EASEMENTS—BURDEN OF PROOF—INTENTION OF PARTIES.

A party asserting the reservation of an implied easement has the burden of proving the claim by a preponderance of the evidence, and such a party will be entitled to prevail where the reservation was clearly the manifest intention of both parties.

6. EASEMENTS—IMPLIED EASEMENTS—RIGHT-OF-WAY—NECESSITY—ALTERNATE ACCESS.

An easement by implication arises out of strict necessity rather than mere convenience, and the presence of an alternate route will persuade a court to find an absence of strict necessity.

7. APPEAL AND ERROR—BOUNDARIES—SURVEYS—FINDINGS OF FACT—WEIGHT OF EVIDENCE.

A finding of a trial court in a boundary and survey dispute will be reversed where such finding is clearly contrary to the overwhelming weight of the evidence, but where there is evidence and testimony to support the finding, the lower court will not ordinarily be reversed.

8. BOUNDARIES—SURVEYS—ORIGINAL STAKES—FACTORS CONSIDERED.

Land surveys should try to determine where the original stakes which marked boundaries of old plats were placed, when such stakes have disappeared; and in determining where the original stakes were located, various types of evidence are admissible including new stakes or monuments which replace old stakes, reference points correlated to other established points, and occupational lines established by long usage, and all of these may be considered by the fact-finder, but no one factor dominates the others as a matter of law.

Appeal from Houghton, Stephen D. Condon, J. Submitted Division 3 October 11, 1974, at Marquette. (Docket No. 17255.) Decided February 24, 1975.

Complaint by Kahn-Reiss, Inc., against Detroit & Northern Savings & Loan Association and Frank A. Douglass Agency, Inc., for enforcement of a

right-of-way agreement and for damages. Counter-complaint by Detroit & Northern for removal of an encroaching structure, or in the alternative, for damages for impairment of the value of Detroit & Northern property. Judgment for defendants on the complaint, and for plaintiff on the counter-complaint. Defendants appeal, and plaintiff cross-appeals. Affirmed.

*Frederick N. Johnson, P. C.* (by *Jeryl A. Manchester),* for plaintiff.

*McLean & McCarthy,* for defendants.

Before: ALLEN, P. J., and J. H. GILLIS and Mc-GREGOR, JJ.

ALLEN, P. J. This appeal from a two-part judgment, May 15, 1973, involves two issues arising out of a sale of property by plaintiff to defendant Detroit & Northern Savings & Loan Association. Issue I is the cross-appeal raising the question of whether or not plaintiff retained an easement of way over a portion of the land sold. On this issue, the trial court in Part I of its opinion found in favor of defendants. Plaintiff cross-appeals. Issue II concerns a boundary-line question of whether defendants could remove a concrete wall and chimney which defendants allege is on the property purchased from plaintiff. On this issue, the trial court in Part II of its judgment found in favor of plaintiff, and defendants appeal. For convenience purposes, defendant Detroit & Northern Savings & Loan Association will be referred to as D&N, and Frank A. Douglass Agency, Inc., as Douglass. References to lots and boundary lines relate to the map attached.

## PART I

In December 1969, plaintiff granted an option to Douglass which was acting as agent for D&N for the purchase of lots 6 and 7 on the diagram attached. This option was drafted by plaintiff's attorney. Paragraph 7 provided:

"After the delivery of a Warranty Deed from Optioner to Optionee, Optionee shall be responsible for the maintenance, not including snow removal, of a suitable and passable means of ingress and egress to the East exit of the Pic Theatre Building, which is adjacent to the described real property. However, the parties hereto may agree to modify the existing route of ingress and egress prior to the execution of documents of transfer of title."[1]

On May 19, 1970, plaintiff by warranty deed conveyed to D&N all of plaintiff's interests in lots 6 and 7. The deed was drafted by D&N and totally omitted any mention of the easement referred to in paragraph 7. Both the option and the warranty deed were signed on plaintiff's behalf by Norbert Kahn as plaintiff's president and by Louise Rice, as plaintiff's secretary. Kahn was an experienced businessman who had assisted Douglass in acquiring other lots in the block and who, prior to the option, had negotiated with Douglass in regard to a fee which he claimed Douglass owed for this assistance. Kahn was a 40% stockholder in Kahn-Reiss Corporation (his wife owned an additional 20%), a 50% shareholder in the corporation-owned

[1] In October 1969, an earlier draft of the option agreement, prepared by plaintiff's attorney, had been submitted to D&N. Paragraph 7 did not contain the words "not including snow removal." When D&N responded they should not be responsible for snow removal, plaintiff's attorney added the phrase "not including snow removal" whereupon a new document dated December 11, 1969 was typed, submitted and accepted as quoted above.

Pic Theatre and was the sole representative of Kahn-Reiss with Douglass on the purchase of lots 6 and 7.

Some months after the execution of the deed, Kahn (who died prior to trial) raised the question of ingress and egress being omitted from the deed and apparently also discussed with Douglass the matter of his commission on other lots purchased by Douglass for D&N. Some time prior to June 17, 1971, Douglass and D&N informed Kahn they would settle the claim for services and the claim for ingress and egress by payment of $1500. On June 17, 1971, Douglass made payment by check to Kahn personally of $1500. No written release of the respective claims was secured from Kahn who informed Douglass when the question was raised "You don't have to have any signature from me, my word is bond". Previously, when lots 6 and 7 were purchased, the check was made out to Kahn-Reiss Corporation but was endorsed over to Kahn individually on the same day.

Following extensive trial on the issues raised in Part I, the court, in a written opinion, held against plaintiff, finding (1) that there was insufficient evidence to support mutual mistake, fraud or misrepresentation, (2) that as a matter of law, the option was merged in the warranty deed, *Clifton v Jackson Iron Co,* 74 Mich 183; 41 NW 891 (1889), (3) that the option as drafted was too indefinite and uncertain to be protected in chancery, (4) that Kahn acted with actual and apparent support for the corporation, and all claims were fully and completely released upon payment to him of the $1500. In its cross-appeal, plaintiff does not contest the trial court's conclusion on (1) but does claim error on (2), (3), and (4). Additionally, plaintiff argues that as a matter of law, plaintiff reserved

an implied easement over lots 6 and 7 for vehicular traffic.

We do not agree with the trial court that as a matter of law the option agreement was merged and thus extinguished in the warranty deed. *Clifton v Jackson Iron Co, supra,* cited by the trial judge, did not involve an easement condition. That case concerned a contract for the sale of land reserving the right of removing growing timber for a specified time. Before the time ran out the owner conveyed the land by warranty deed without mentioning the right to remove the timber. The court held the deed nullified the timber-cutting rights. Neither did we find the cases relied on by plaintiff, *Goodspeed v Nichols,* 231 Mich 308; 204 NW 122 (1925), and *Mueller v Bankers Trust Co of Muskegon,* 262 Mich 53; 247 NW 103 (1933), each of which holds that a warranty deed does not extinguish a *collateral* contractual provision, controlling.[2] These cases, too, do not involve an easement reservation. In fact, we can find no decision in Michigan involving the reservation of an easement and thus an open question exists as to whether or not a contractual provision for an easement is "collateral". Accordingly, we look to *Chicago Title & Trust Co v Wabash-Randolph Corp,* 384 Ill 78; 51 NE2d 132 (1943). In that case the court held, *inter alia,* that, where a purchaser's agreement to establish an easement which could not become effective until after delivery of their deed, the easement provision was not merged in the deed upon delivery of the deed so as to render such provision in the contract ineffectual. The court

---

[2] In *Goodspeed,* the contract for sale called for repair and warranty of certain parts of a home which was the subject of the sale. *Mueller* involved a contract for the sale of land containing a provision that the seller would either build a bridge across Green Creek or provide a right of way out to Memorial Drive.

recognized the contractual easement provision as one which the delivery of the deed did not fulfill, hence rejecting the general rule that if terms of a contract for sale of realty are fulfilled by delivery of the deed, there is a merger of the contract and the deed. See also in this connection the helpful annotation entitled *Deed As Imposing Upon Vendee Obligation Additional To, or as Superseding or Merging Obligations Imposed By, Antecedent Contract,* 52 ALR2d 647 (1957). The instant case closely parallels *Chicago Title and Trust Co,* particularly because the option paragraph calls for a condition "after the delivery of a warranty deed".

Was the option too indefinite and uncertain to be protected and enforced by an equity court? Both parties acknowledge the general rule stated in *Fox v Pierce,* 50 Mich 500, 504; 15 NW 880 (1883), but differ as to whether it applies in this situation. This case was tried before the trial judge, who had the opportunity to examine the exhibits, listen to the testimony and assess its weight and credibility. The trial court's finding that the option was too indefinite will not be reversed unless we are persuaded that the determination was clearly erroneous. GCR 1963, 517.1. See *Osius v Dingell,* 375 Mich 605, 611–612; 134 NW2d 657 (1965). See also *Levi v Winters Floor Covering, Inc,* 57 Mich App 226; 225 NW2d 693 (1974).

*Fox v Pierce, supra,* contained a statement which subsequently was adopted as the general rule in *Stolte v Krentel,* 271 Mich 98, 102; 260 NW 127 (1935), which noted that the following was the "legal yardstick" by which the instant issue is to be governed:

"Now a right of way which is too indefinite for a determinate description is too indefinite to be estab-

lished and protected by the court of chancery. Assuming that the right which is actually in controversy, or rather the right which complainants contemplate, to be capable of such a description, the rule then applies that the complainant must so state his case that if admitted by answer, or proved at the hearing, the court can decree upon it. Has that been done? Are the means given to enable the court to declare in its paper decree exactly what right of passage exists, and of what shape and dimensions the place is, and precisely where it is located with reference to lot lines and permanent erections?" 50 Mich 500, 504.

*Stolte,* upon which plaintiff relies, has found that the description of the right-of-way was clear, and that the "termini" of that right-of-way became "monuments" which would control the courses and distances involved. Since the apparent purpose of the parties was inconsistent with a distance specifically recited in the agreement, the distance had to fall and the monuments controlled. 271 Mich 98, 102. See also *Murray v Buikema,* 54 Mich App 382, 387; 221 NW2d 193 (1974), which recognized this general rule. However, that rule does not really apply to our situation.

As noted in *Fox, supra,* we must determine whether or not plaintiff has proved that the option agreement was definite enough, by way of a description of the right of passage, the shape and dimensions of the property and passage involved, and exactly where the passage was located with reference to specific lot lines and permanent structures. 50 Mich 500, 504. Our Court has recently noted that if the description in the written document was insufficient, other extrinsic evidence may be examined to determine the specific property which was allegedly subject to the parties' transaction. Such factors as the circumstances of possession and ownership, the relation of the par-

ties and their relationship to the property, as well as the negotiations involved, may be examined to determine the description of the interest at issue. *Domas v Rossi,* 52 Mich App 311, 313–314; 217 NW2d 75 (1974).

Paragraph 7 of the option, recited above, provided that defendants were to maintain a "means of ingress and egress to the east exit of the Pic Theatre building, which is adjacent to the described real property". The "described real property" was lots 6 and 7, whereas lot no. 9 was the lot onto which the east exit of the theatre opened, with lot no. 8 adjoining lot no. 9. The attorney who drafted the option agreement stated that Mr. Kahn wanted a right-of-way so that people may be able to get to the east exit, although it is clear that that exit was only a fire door and people did not enter the theatre via that route. Mr. Kahn was also interested in having the theatre patrons use the rear lots for parking, and wanted to be able to have people leave the theatre via the east exit and get into their cars. He said that Kahn "wanted to maintain that as much as possible. I gathered that he was concerned about business effect on customer parking". This parking apparently took place on lots 8 and 9, rather than lots 6 and 7, which were the subject of the option agreement. The attorney said that Kahn was concerned with parking facilities for the theatre patrons and the tenants in another building, and the attorney said that he did not have "the slightest idea" as to how those people were to get to the theatre. He said "I did not discuss that with Mr. Kahn". He said that he drafted the option not having "all of the legal descriptions involved", that he drafted "broad language", and when questioned about the apparent error in referring to lots 6 and 7 as adjacent to the

Pic Theatre building, replied "It is ambiguous language. I can't tell you why I used that".

Robert Borsum, president of Douglass Agency, testified that Kahn desired the easement because he was "concerned about ingress and egress out of the Pic Theatre on an emergency basis for a fire exit", and later acknowledged the fact that lots 6 and 7 had been "used as a parking facility". However, he repeated the fact that Kahn desired and intended to have an ingress and egress serve as "an emergency exit from the Pic Theatre for fire purposes". He said that Kahn was "concerned about the Pic Theatre".

While many of the above factors regarding the need for parking and egress from the Pic Theatre building will be involved in our discussion of whether there was an easement by implication, we have discussed them now to highlight their absence from the option agreement. Not only was the option agreement erroneous as to its statement that the Pic Theatre was adjacent to lots 6 and 7, but no mention is made of parking or vehicular traffic. While the "east exit" was referred to—it perhaps could be called a monument—there was no specific recital, in either the testimony or the option agreement, of the specific shape or dimensions of the claimed passageway, nor was there any reference to lot lines or other specific structures. An easement for pedestrians? Or for vehicles? The language is ambiguous and the testimony conflicting.

Unlike the situation present in *Greve v Caron,* 233 Mich 261, 264; 206 NW 334 (1925), paragraph 7 failed to contain a specific dimension (in that case, the right to a 10-ft-wide alley in the rear of the property). There was no express provision in the document, or in the testimony, which clearly

set forth the specifics of the pathway. Likewise, *Stolte, supra,* upon which plaintiff relies, involves not only a specific description, by metes and bounds of the easement, but also clear evidence, particularly the monuments discussed therein, which evidenced the parties' intent. 271 Mich 98, 102–104. Likewise, the statement that one had the right-of-way "for a road over, through and across" a certain parcel, combined with the fact that the bounds of that right-of-way had been staked out at least five years previous to the delivery of the deed, was sufficiently definite so as to allow a court to enforce the easement. *von Meding v Strahl,* 319 Mich 598, 610–611; 30 NW2d 363 (1948). It is obvious that our case does not involve such clarity, and that it also fails to approach the definiteness involved in a pipeline situation in which plaintiff saw the workmen laying the first part of the pipeline, saw the stakes which had been set out before he signed the document and where the document expressly recited that the pipeline could not be placed within 100 feet of any building on the premises involved. *Johnston v Michigan Consolidated Gas Co,* 337 Mich 572, 578; 60 NW2d 464 (1953).

Having examined the case law and the facts present in this situation, we are unable to conclude that the trial court was clearly erroneous in finding that the option as drafted was too indefinite to receive "enforcement", and we affirm the trial court's decision on that point.

Plaintiff's claim that as a matter of law, plaintiff reserved an implied easement over lots 6 and 7 for vehicular traffic was not pursued before the trial court, and the trial court therefore lacked the opportunity to specifically rule upon this claim. Generally, an issue not raised below is precluded

from appellate review. See *Huey v Campbell, Wyant & Cannon Foundry Co,* 55 Mich App 227, 230; 222 NW2d 191 (1974). However, this rule is not absolute and, if the question is one of law, and all of the facts necessary for its resolution have been presented, our Court may review the claim. *Huey, supra.*

The party asserting the reservation of an implied easement has the burden to prove the claim by a preponderance of the evidence. *Ketchel v Ketchel,* 367 Mich 53, 57–58; 116 NW2d 219 (1962). A person making such a claim will be entitled to prevail where the reservation was clearly the manifest intention of the parties. *Harrison v Heald,* 360 Mich 203, 206–207; 103 NW2d 348 (1960). Additionally, an easement by implication arises out of strict necessity rather than "mere convenience", and the presence of an alternate route will persuade a court to find an absence of strict necessity. *Waubun Beach Assn v Wilson,* 274 Mich 598, 609–612; 265 NW 474 (1936). On the other hand, a court may find an easement by implication or right-of-way by necessity if there is no alternate means of access. See *Birch Forest Club v Rose,* 23 Mich App 492, 497; 179 NW2d 39 (1970).

*Zemon v Netzorg,* 247 Mich 563; 226 NW 242 (1929), is somewhat helpful on this point. Plaintiff therein sought an easement over adjacent property to reach the rear of his premises which fronted on Jefferson Avenue. *Zemon* held that plaintiff was not entitled to an easement by way of necessity on the grounds that his premises were accessible from Jefferson Avenue without having to use the alleged easement. 247 Mich 563–566.

In the instant case, plaintiff claims that he needs the easement over lots 6 and 7 for vehicular

traffic. At the outset we refer to the evidence discussed above, which casts serious doubt over whether Kahn was concerned with the need for vehicular access to lots 8 and 9. Pedestrian access to the fire door which opens onto lot 9 seemed to be a major concern of Kahn's. However, even if vehicular access is needed, we find that convenience rather than strict necessity is present in this case. We have seen that strict necessity must be present if one is to obtain an easement by implication. 2 Thompson on Real Property, (1961 Ed), §§ 353, 358, pp 335–336, 385; 10 MLP, Easements, §§ 14, 16, pp 107, 110, and cases cited above. A driveway or alley, approximately seven feet wide, provides access to lots 8 and 9 from Quincy Street, upon which the Pic Theatre building fronts. Although this fairly narrow passageway may preclude the ability of a large service or delivery vehicle from entering lots 8 and 9, we find that plaintiff has failed to prove by a preponderance of the evidence that there is a strict necessity for such access and that his claim is based on anything more than mere convenience. While it may be inconvenient for the theatre's furnace heating complex to be serviced via the Quincy Street entrance, the Court finds that this inconvenience lacks the significance of "strict necessity" and does not justify the finding of easement by implication.

In light of our finding that plaintiff did not have an easement, it is unnecessary to determine whether or not Kahn's acceptance of the $1500 check from defendant waived or released Kahn's claim to the alleged easement.

We have examined the record of the proceedings below and are unable to conclude that the court was clearly erroneous. As to Part I, the trial court

reached a fair and practical result, and we have not been persuaded to the contrary.

## *PART II*

Part II of the trial court's judgment, May 15, 1973, concerns a 2.35-foot concrete wall and chimney located along the east wall of the Kahn-Reiss Building situated on the north half of lot 8, and shown on the attached diagram. Following a fire in 1959 which destroyed a wooden building then located on lot 7, plaintiff erected a concrete supporting ledge along the east wall of its building whose floor joists were charred by the fire and whose bricks in the east wall were loosened. This wall, constructed by a local contractor, is about 2.35 feet in width, 2 feet in height, and sunk into the ground about 2 feet. At the time lots 6 and 7 were conveyed by warranty deed, there was no survey of the property, and the exact location of the boundary line between lots 7 and 8 was not known although the wall and chimney were clearly visible. When D&N completed its land survey June 20, 1970, it first became aware that the concrete wall had allegedly been constructed entirely on lot 7.

Architects for D&N testified that the association purchased the property (including other lots not involved in this dispute) for the purpose of constructing a new office building with a drive-in facility which would be located on the west side of lot 7. The building has been completed at a cost of some $3 million except for the drive-in facility portion thereof which has been delayed by this litigation. In the event the concrete ledge is not removed, the drive-in facility would require redesigning and relocation easterly, at an additional cost of $10,000, not including the design fees.

Relocation would also restrict drive-in circulation and reduce proposed adjacent parking. Conversely, plaintiff claims that any removal of the concrete wall would eventually cause the east wall of its building to collapse with resulting irreparable harm and injury.

At trial on issue II, each party presented the results of an independent survey. Plaintiff's survey, conducted by a registered surveyor, is referred to as the "Riipi Survey". It shows that only .057 feet (7 inches) of the concrete abutment encroaches on lot 7. D&N's survey, made by a registered engineer but not registered surveyor, is referred to as the "U. P. Survey". It shows 2.35 feet (the entire wall width) lying on lot 7. After hearing the respective witnesses, the trial court found the Riipi Survey the correct survey and ruled that the north-south property line between lots 7 and 8 "as determined thereby" is the correct and legal boundary line.[3] This 7-inch overlap was considered by the court to be so trivial an encroachment that no monetary damages as claimed by either of the parties were awardable.

Block 1, first addition to the Village of Hancock, was platted without a metes and bounds description. It was described by stakes or monuments of title, all of which in the course of time have disappeared. Consequently, each survey had to commence at some other ascertainable point and

---

[3] "Of the two expert witnesses, Riipi and Stardahl, the former a registered surveyor, the latter an unregistered surveyor, on the issue presented here, the Court is forced to give greater credence to the testimony of Riipi and greater weight to the accuracy of the 'Riipi Survey'; in this regard, the Court finds that Plaintiff has met the burden of proof by a preponderance of the evidence and that the same is sufficient to sustain its claim.

"The Court finds that the 'Riipi Survey' is the correct survey and that the North-South property line between lots seven (7) and eight (8) as determined thereby is the true, correct and legal boundary line between said lots."

work backwards to Block 1. Further complicating the problem of finding an ascertainable and definite starting point in Block 1 was the fact that Block 11 of the original plat of the Village of Hancock which lies next east of Block 1, first addition to the Village of Hancock, also was platted without a metes and bounds description. Furthermore, its recited plat frontage of 350 feet on Quincy Street was determined upon measurement to be 352 feet. Consequently, any attempt to correlate to lots 6 and 7 by measuring easterly along Quincy Street from a point on Block 11 was marred by such variables as whether the overrun occurred only at the northeast corner of Block 11 (as contended by plaintiff) or whether it spread evenly so as to affect the northwest corner of Block 11. Given these technical difficulties each surveyor selected a different point of beginning, different points of correlation and applied different methods of acceptable surveying procedure. In superbly prepared briefs, replete with surveying diagrams and supporting geometric tables, each party argues the superiority of its respective survey.

In such a situation the appellate function is not to assume the rule of surveyor or even to express a preference between surveys. This is the function of the trial court which had the advantage of seeing and hearing the witnesses and determining which to believe more.

"Cases involving equity jurisdiction are reviewed in this Court *de novo,* but ordinarily the Court will not reverse the lower court where there is evidence and testimony to support the finding of the lower court unless justice demands, or the evidence clearly preponderates the other way. Primarily, this is because the trial court is in a better position to determine the

credibility of witnesses by observing their conduct and demeanor in court, an opportunity which the reviewing court on appeal obviously does not have." *Osius v Dingell,* 375 Mich 605, 611–612; 134 NW2d 657 (1965).

Where, however, the finding of the trial court in a boundary and survey dispute is clearly contrary to the overwhelming weight of the evidence, the finding will be reversed. *Hustina v Indian Refining Co,* 222 Mich 369; 192 NW 718 (1923).

We have closely examined the record and proofs in the instant case and in no respect find an overwhelming weight of evidence in favor of the U. P. Survey. In fact, on many points, the record substantiates the trial court's conclusions. D&N's sole witness as to the accuracy and methodology of the U. P. Survey was an engineer but not a registered land surveyor. He once had taken the examination for registered land surveyor and had failed. He testified that land surveying as such is not a primary segment of his company's work. William Riipi, in charge of the Riipi Survey, was a registered land surveyor. The Riipi Survey checked to an accuracy of one foot error to every 9000 feet measured. This compared with an accuracy standard established by the profession of one foot to every 5000 feet. The U. P. Survey checked to a standard of one foot to 4168 feet which the witness conceded was not within the generally accepted standard. Further, the U. P. Survey was not closed upon the ground by actual ground measurements, but was closed by mathematics from bearings and distances previously determined and recorded on the plat. Lines in the Riipi Survey were closed by actual ground measurement. The basic difference between the surveys is the location of the east line of Block One, First Addition Plat, which is also the

west line of Montezuma Street.[4] The parties' well prepared briefs are chiefly devoted to highly technical arguments supporting the superiority of method by which the east line was determined. No useful purpose would be served by a recital of these arguments. Suffice it to say a factual question was presented upon which the trial court, having the advantage of observing the witnesses and hearing their testimony, makes a finding of fact. Our detailed examination of the record supports the findings of the trial court. Clearly the evidence does not preponderate the other way.

Defendants make the point that the record discloses that adoption of the Riipi Survey results in multiple encroachments within the block. This is because lot lines would be moved east of presently recognized occupational lines. Adoption of the U. P. Survey results in only one encroachment—that being the concrete wall in the instant case. This being so, defendant, relying upon *Diehl v Zanger,* 39 Mich 601 (1878), and related cases, asserts that as a matter of law the trial court was in error. According to defendant's interpretation, *Diehl* holds that in situations where original monuments of title have disappeared, practical and long-established lot lines prevail over new survey lines.[5] The majority opinion in *Diehl* did not go so far as to hold that occupational lines would control

---

[4] "Both surveys, after establishing a different East line of said Block then proceed West 264 feet to establish the North-South property line between lots seven (7), and eight (8), resulting in a difference of some 1.8 feet. Both surveyors attempted to correlate their results with adjacent plats—the First Addition Plat having no existing original monuments." (Lower court opinion)

[5] Related cases relied upon by defendant hold that old fence lines and other monuments recognized as occupation lines, are better evidence of true lot lines than surveys based on uncertain monuments. *Breakey v Woolsey,* 149 Mich 86, 89; 112 NW 719 (1907); *Wilmarth v Woodcock,* 66 Mich 331, 337; 33 NW 400 (1887); *Beaubien v Kellogg,* 69 Mich 333, 342–343; 37 NW 691 (1888).

as a matter of law but only held that such facts were part of the evidence which the trial court erroneously excluded from jury consideration. The case was remanded to the lower court so that occupational lines, together with other evidence, could be evaluated by the jury.[6] In the instant case the trial court heard evidence both of occupational lines and correlation to established stakes and monuments of title, the record being replete with evidence that the Riipi Survey located in the field and used as controlling settled pins, corners and street lines in adjoining blocks. Also, the U. P. Survey's place of beginning (the corner of a building in Block 1) disregarded evidence of hedge lines lying to the east of the building and which, if used, would have brought the results of the two surveys close together.

Finally, we do not share defendant appellant's concern that affirmance of the trial court on Part II will, per se, result in encroachments within Block 1. The Court's final order implementing its opinion limits its finding as to the proper line to "prevail and remain as such, solely between the respective parties herein involved, their successors and assigns". In no way does the court readjust either the west line of lot 8 or the established lot lines of other lots within the block.

Affirmed, no costs, neither party having prevailed in full.

---

[6] A more accurate statement of law would be: (1) where original stakes which mark boundaries of old plats have disappeared, surveys should try and determine where the original stakes were placed. *Carpenter v Monks,* 81 Mich 103; 45 NW 477 (1890); (2) In determining where the original stakes were located, various types of evidence are admissible including new stakes or monuments which replace old stakes, reference points correlated to other established points, and occupational lines established by long usage. All of these may be considered by the fact finder, but no one factor, such as occupational lines, dominates the others as a matter of law.