SIIRILA v BARRIOS

Docket No. 56786. Argued June 8, 1976 (Calendar No. 11).—Decided
December 21, 1976.

Plaintiff James Siirila, for himself and as next friend of James
Scott Siirila, a minor, brought a medical malpractice action
against Honorato Barrios, M. D., St. Joseph's Hospital, Air
Shields, Inc., and Mira Corporation for damages arising when
the child, a premature infant, was exposed to oxygen for an
extended time in an infant incubator at the hospital, which
resulted in retrolental fibroplasia and blindness. The trial court
ruled inadmissible testimony by the plaintiff's expert witness, a
pediatrician from Marquette, as to the standard of care in the
community on the basis that the expert was a specialist and
defendant Barrios was a general practitioner in Houghton, and
instructed the jury to disregard the expert's testimony in
determining the standard of care. A jury in Houghton Circuit
Court, Stephen D. Condon, J., found no cause of action and
judgment was entered for defendants Dr. Barrios and the
hospital. Defendant Air Shields, Inc., the manufacturer of the
incubator, was granted a directed verdict, and plaintiff volun-
tarily dismissed defendant Mira Corporation, the manufacturer
of the oxygen analyzer. The Court of Appeals, Bashara, P. J.,

---

REFERENCES FOR POINTS IN HEADNOTES

[1–4, 7–9, 12, 15, 16] 61 Am Jur 2d, Physicians, Surgeons and Other
Healers §§ 110, 112 *et seq.*

Competency of physician or surgeon of school or practice other than
that to which defendant belongs to testify in malpractice case. 85
ALR2d 1022.

[2, 4, 8, 9, 13] 61 Am Jur 2d, Physicians, Surgeons and Other Healers
§ 199 *et seq.*

[5, 6] 61 Am Jur 2d, Physicians, Surgeons and Other Healers § 198 *et
seq.*

[6] 75 Am Jur 2d, Trial § 674 *et seq.*

[10, 11] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*

[14, 15] 61 Am Jur 2d, Physicians, Surgeons and Other Healers § 138.

Malpractice: physician's failure to advise patient to consult special-
ist or one qualified in a method of treatment which physician is
not qualified to give. 35 ALR3d 349.

[17] 20 Am Jur 2d, Courts § 183 *et seq.*

and R. B. Burns and Allen, JJ., affirmed (Docket No. 16222). Plaintiffs appeal. In an opinion by Justice Williams, in which Chief Justice Kavanagh and Justices Levin and Ryan concurred, it was *held:*

1. The issue of the locality rule as a measure of the standard of care was not preserved for review.

2. A specialist may testify as to the standard of care of a general practitioner so long as the witness has knowledge of the general practitioner's standard of care.

3. It is incumbent on the person offering the expert witness to show his qualification to testify. In this case, although the trial judge erred in ruling that one specialist would not be permitted to testify as to the standard of care of a general practitioner without first permitting questioning to determine whether he knew the relevant standard of care, the error was harmless because the specialist admitted in a separate record that he did not know the standards of practice in Houghton-Hancock or similar communities and would therefore not have been qualified on that basis. As to another specialist, the plaintiff was given the opportunity to demonstrate his competency to testify and did not do so.

4. A request for a jury instruction concerning the effect of the absence of an entry in the hospital medical record was properly refused by the trial court because the Standard Jury Instructions recommend that no instructions be given on hospital and business records, because the instruction was unnecessary where evidence was admitted and argued under the statute which permits the lack of an entry to be considered as evidence of the nonoccurrence of an event under certain circumstances, and because the instruction as requested was inaccurate since it did not state that to be considered an entry must be made in the regular course of business, and that it must be the regular course of business to make such entries had such an event occurred.

Justice Coleman, joined by Justices Fitzgerald and Lindemer, concurred. She wrote that:

1. The trial judge properly instructed the jury to consider the standard of care employed by Dr. Barrios not only in the light of the standards of Houghton but also of similar communities. The circuit judge did exactly what the plaintiff urged in his complaint. The Supreme Court cannot make a different case at this level of the proceedings.

2. A physician who is a general practitioner is under a duty to use that degree of care and skill which is expected of

reasonably competent practitioners of the same class, acting under the same or similar circumstances, in the same community or similar communities.

3. Dr. Barrios did not hold himself out as a specialist but as a general practitioner. He thus should not be judged by a specialist's standard of care, and the trial court properly excluded the expert witness's testimony from consideration in determining the standard of care because the witness was a specialist, rather than a general practitioner like Dr. Barrios, and from Marquette, rather than a community similar to Houghton.

Justice Williams, joined by Justice Levin, also wrote a separate opinion in which he discussed the locality rule because in both the Court of Appeals and the Supreme Court the parties had treated the locality rule as the salient issue. He would hold that:

1. A general practitioner is under a duty to use a degree of care and skill which is that of a reasonably competent practitioner of the same class acting under the same or similar circumstances, having in mind (a) the state of the art at the time, (b) whether a specialist should reasonably have been consulted, and (c) such local factors as might be pertinent.

2. The purpose of the locality rule historically was to recognize a disparity in the quality of medical care between rural and urban areas. In Michigan it has been recognized, but the Court has insisted that the state of the art be kept in mind and that inadequate service in a locality is not excusable if the practitioner should have reasonably referred the case to a specialist. The tremendous improvements in general medical education, communications, and transportation, and the recognized obligation of any professional to keep abreast of progress, have rendered obsolete the reasons for maintaining greater emphasis on geography than on the state of the art.

3. The parties may present evidence indicating whether the defendant physician should have been expected to diagnose or treat the patient differently based primarily on the general state of knowledge of the subject condition within the medical community of general practitioners as a whole. The parties may also present evidence indicating whether the defendant physician reasonably should have recognized that the medical problem presented required the diagnosis or treatment of a specialist or at least a physician with more training or skill than the defendant. The defendant may come forward with proof of local factors which would warrant deviation from a general or national standard of care, where the locality is defined as coextensive with the medical and professional means

available in those centers that are readily accessible for appropriate treatment of the patient.

58 Mich App 721; 228 NW2d 801 (1975) affirmed.

OPINION OF THE COURT

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EXPERT WITNESSES—
   GENERAL PRACTITIONERS—SPECIALISTS.

   A medical specialist may testify in a trial for medical malpractice as to the standard of care of a general practitioner when the specialist has knowledge of the standard of care about which he is testifying.

2. WITNESSES—EXPERT WITNESSES—COMPETENCE.

   Ordinarily, the qualification of competence of expert witnesses is a matter for the discretion of the trial judge; it is incumbent upon the person offering an expert witness to show that the witness possesses the necessary learning, knowledge, skill or practical experience to enable him to give such testimony.

3. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—
   SCHOOL OF TREATMENT.

   Generally, where there are different schools of medical treatment, a physician is to be judged by his ability to adhere to the requisite standard of care of the school to which he adheres.

4. PHYSICIANS AND SURGEONS—MALPRACTICE—EXPERT WITNESSES—
   SCHOOL OF TREATMENT—STANDARD OF CARE.

   A member of one school of medical treatment may testify in a suit for malpractice as to the standard of care applicable to a defendant practitioner adhering to another school as long as the proffered expert witness is familiar with the applicable standard of care of the defendant's school of treatment.

5. EVIDENCE—MEDICAL RECORDS—NONOCCURRENCE OF EVENT.

   Medical records may be considered as evidence not only of the happening of events recorded therein, but also as evidence of the nonoccurrence of certain events in the absence of any entry thereof where the entries in the records are usually made in the ordinary course of business if such an event had occurred (MCL 600.2146; MSA 27A.2146).

6. PHYSICIANS AND SURGEONS—MEDICAL RECORDS—INSTRUCTIONS TO
   JURY.

   A request in a trial for medical malpractice for an instruction to the jury concerning the effect of the absence of an entry in a hospital medical record as proof that an event did not occur

was properly refused by the trial court because the Standard Jury Instructions recommend that no instruction be given on hospital records, because an instruction was unnecessary where evidence of the absence of the entry was admitted and argued, and because the instruction was inaccurate where it did not state that to be considered as evidence an entry must be made in the regular course of business, and that it must be the regular course of business to make such entries had such an event occurred (GCR 1963, 516.6[3]; SJI 2.12; MCL 600.2146; MSA 27A.2146).

### CONCURRING OPINION

### COLEMAN, FITZGERALD, and LINDEMER, JJ.

7. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—GENERAL PRACTITIONER.

*A physician who is a general practitioner is under a duty to use that degree of care and skill which is expected of reasonably competent practitioners of the same class, acting under the same or similar circumstances, in the same community or similar communities.*

8. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—SPECIALIST.

*A physician who holds himself out as a specialist is under a duty to use that degree of care and skill which is expected of a reasonable specialist practicing in the light of present day scientific knowledge; therefore, geographical conditions or circumstances control neither the standard of a specialist's care nor the competence of an expert's testimony regarding that standard.*

9. PHYSICIANS AND SURGEONS—MALPRACTICE—GENERAL PRACTITIONER —SPECIALIST—EXPERT WITNESS.

*A physician charged with malpractice who was a general practitioner in a small rural community and did not hold himself out as a specialist should not be judged by a specialist's standard of care; therefore, testimony of an expert witness who was a specialist in a larger urban area was properly excluded as to the standards of practice as they affect the general practitioner.*

### CONCURRING OPINION

### WILLIAMS and LEVIN, JJ.

10. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—APPEAL AND ERROR—PRESERVING QUESTION.

*The issue of whether the standard of care for general practition-*

ers should be judged by the practice in the same or similar communities should be considered by the Supreme Court although it was not challenged in the complaint or by request for instructions to the jury, but was considered and decided in the Court of Appeals, where the trial court stated that it was "not going to venture into a new realm of law" when the issue was first raised, which would indicate that objections or requests for instructions on the issue would have been fruitless, and where the factual record relevant to appellate determination is complete so that the taking of further testimony is not required.

11. APPEAL AND ERROR—PRESERVING QUESTION.

The general rule that a question may not be raised for the first time on appeal to the Supreme Court is not inflexible; when consideration of a claim sought to be raised is necessary to a proper determination of a case, the rule will not be applied where the issue is one of law and all of the facts necessary for its resolution have been adequately presented.

12. PHYSICIANS AND SURGEONS—STANDARD OF CARE—GENERAL PRACTITIONER.

A general practitioner of medicine is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class acting under the same or similar circumstances, with the state of the art for the particular medical situation, the reasonableness of consulting with a specialist, and characteristics of the locality which might be pertinent as among the factors to be considered.

13. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE.

A case of medical malpractice, as opposed to other negligence, as a general rule may not be established without expert testimony of those learned in such matters, except for rare cases in which the facts may be understood by persons without medical training.

14. PHYSICIANS AND SURGEONS—MALPRACTICE—SPECIALISTS—CONSULTATION.

A physician who is a general practitioner is not serving the public with due care, even if a medical problem is beyond the capabilities of a practitioner in the same or similar localities, if the practitioner reasonably should have understood that diagnosis or treatment was beyond his skills and that the patient reasonably should have been referred to a specialist.

15. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE—
    GENERAL PRACTITIONER.

 *Evidence may be presented in a medical malpractice action to indicate whether a defendant physician who was a general practitioner should have been expected to diagnose or treat the plaintiff patient differently based primarily on the general state of knowledge of the subject condition within the medical community of general practitioners as a whole.*

16. PHYSICIANS AND SURGEONS—MALPRACTICE—STANDARD OF CARE.

 *The standard of care in medically similar localities is but one circumstance in determining the skill and care required of a physician; the defendant in a medical malpractice action may come forward with proof of local factors which would warrant deviation from a general or national standard of care, where the locality is defined as coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient.*

17. APPEAL AND ERROR—PRECEDENT—NEW RULE OF LAW—APPLICA-
    TION.

 *The Supreme Court in defining the limits of adherence to precedent may apply a new rule of law to all cases tried after the date of the opinion announcing the rule or retroactively.*

*Lopatin, Miller, Bindes & Freedman (Michael H. Feiler,* of counsel) for plaintiffs.

*Platt, Peacock & vonWiegen* for defendant Barrios.

*McClean & McCarthy* for defendant St. Joseph's Hospital.

WILLIAMS, J. This malpractice case raises three questions. The first question is whether a properly qualified medical specialist witness may testify as to the standard of care that a general practitioner should meet. The second question is what the proper standard of care should be. The third question is whether the trial court properly refused to give an instruction that proper hospital records

may be used to show that an action had not taken place as well as that an action had taken place.

As to the first question, we hold that a specialist may testify as to the standard of care of a general practitioner as long as the specialist is familiar with the applicable standard of the general practitioner.

However, since the proper foundation for one of plaintiffs' witnesses was not laid despite opportunity to do so, and since the other affected by this ruling admitted not knowing the standard of practice in the relevant communities, and therefore could not testify anyway, we affirm the Court of Appeals and the trial court.

As to the second question, we hold in this opinion that the question as to what the proper standard of care should be was not preserved.

As to the third question, we hold that in this case the instruction was properly not given.

## I—FACTS

James Scott Siirila was a premature baby, born at 5-1/2 months, in St. Joseph's Hospital in Houghton, November 19, 1967. He weighed 2 pounds, 1 ounce at birth.

The attending physician, Dr. Honorato Barrios, had been a general practitioner in the Houghton-Hancock area since 1965. He ordered the child immediately placed in an Isolette infant incubator, where he remained, under controlled oxygen flow for about two months.

Dosage was apparently 3 liters per minute, from November 19, 1967 to November 26, 1967, then 2 liters per minute to December 7, when it was reduced to 1 liter per minute until December 12, when the flow was increased to 2 liters per minute

for two days, after which it was reduced to 1 liter per minute for one day. The baby was removed from the Isolette for 20 minutes the following day, then replaced at a rate of probably 2 liters per minute for three days, when it was removed for 10 minutes, then returned for an amount of either 1 or 2 liters until the following day. The child was removed from the Isolette from December 19 to December 26, when the oxygen was supplied for 2 liters per minute for five hours. It was apparently started briefly for an undetermined time and dosage on December 29, after which the child was permanently removed from the Isolette.

According to hospital testing, a flow rate of 3 liters per minute was equivalent to an oxygen concentration of approximately 36%–38% in the Isolette (subject to 2% inaccuracy). Two liters per minute of oxygen reflect an approximate concentration of 32%–36% oxygen, and 1 liter per minute, 27%–31%, plus or minus 2%.

The child was discharged from the hospital February 10, 1968. Two weeks later, Dr. Barrios observed the baby had small eyeballs, but he attributed this abnormality to the child's premature birth. On March 23, at the six-weeks checkup, the mother reported her son had trouble with his sight. For the first time, Dr. Barrios used an ophthalmoscope and detected a scar on the retina.[1] Believing that there was a serious pathology of the eye, Dr. Barrios wrote, on March 25, to Dr. Norman L. Matthews, a pediatrician at St. Luke's Hospital, Marquette, Michigan, for an appointment. Dr. Barrios requested that Dr. Matthews evaluate the child's general condition, but, particularly, his eyes. In the letter, he indicated concern

[1] Specific findings included nystagmus, or eye movement typical of the child who has lost his sight, opacity of the lens of the eye and a white retina.

about opacity through refraction media, and gave
Dr. Matthews information about the baby's prema-
turity, medication and nutrition.

Dr. Matthews replied on March 27, 1968, having
made an appointment for the infant with Dr. John
Kublin, a Marquette ophthalmologist, for April 2.
He said that if the family was poor and would
have problems transporting the child to Mar-
quette, help was available. He also analyzed:

"Since the boy was born very small, one wonders
whether or not he has retrolental fibroplasia. This may
not be the diagnosis, but it may be well to know how
much oxygen he had as an *[sic]* premature."

Dr. Barrios replied on April 3 that "the baby had
oxygen continuously from the birthdate [11/19/67]
until 12/29/6[7]. Initially the oxygen was given at
3L. (40% concentration), and then reduced to 2L.
and 1L."

On April 18, Dr. Matthews wrote and reported
to Dr. Barrios that Dr. Kublin found

"severe retrolental fibroplasia. He does not think
there is any chance that the child will have any vision.

"You might have the hospital check very carefully
the oxygen regulator on their incubators there to make
sure that the oxygen content of the inside of the incuba-
tor will not be higher than 40%. Presumably, even 40%
may not be safe over the prolonged period of time."

Plaintiffs filed an action against Dr. Barrios and
St. Joseph's Hospital, claiming the retrolental fib-
roplasia and the consequent total and permanent
blindness was caused by the infant's continued
exposure to oxygen while in the Isolette. They
alleged medical malpractice by the physician and
the hospital for allowing the baby to unnecessarily

remain in oxygen for the extended period of time and for failing to properly maintain, control and measure the oxygen flow in violation of the standard of care.

At trial, plaintiffs attempted to have Dr. Matthews testify as to the proper care and treatment of premature babies and the danger of oxygen therapy. The court ruled that Dr. Matthews would be prohibited "from testifying as to the standard of care in this community or similar communities on the basis that he's a specialist". Counsel was permitted, however, to make a separate record.

On this special record, Dr. Matthews said he did not know how oxygen was used in Houghton-Hancock, and that he was not capable of establishing what the standards of practice were in the area in 1967. However, he did testify that prior to the Siirila baby he had seen only one other case of retrolental fibroplasia (RLF) within the period 1955 to 1967. Prior to 1955, he said, such cases were seen frequently. He attributed the reduction in RLF to the information available to the medical profession that the use of oxygen in premature babies over prolonged periods of time caused the condition. He testified that 40% oxygen is the maximum concentration usually ordered, and indicated that, according to standard books of pediatrics, oxygen should be used for as short a period of time at as low a concentration as possible.[2]

―――――――――――――

[2] According to Adler's *Textbook of Ophthalmology* (W B Saunders Co, 8th ed 1969), "This [RLF] is an oxygen-induced retinopathy in premature infants who weigh less than four pounds" and "[r]etrolental fibroplasia has, to a great extent, been eliminated by careful regulation of oxygen therapy". 24–25. In the chapter on Pediatric Ophthalmology, it is observed that RLF was virtually unknown prior to 1940, when "it became the vogue to treat irregular respiration in premature infants with high concentrations of oxygen". By 1953 "it was estimated that 50 per cent of all blindness in institutionalized children up to the age of 7 was a result of retinopathy of prematurity". By 1952 the relationship of the disease to both the level and

He testified that proper procedure would have been that after two or three days at the 40% oxygen level, the Siirila baby should have been removed from oxygen, with continued exposure only if there were "very solid evidence of poor condition of the baby". He saw no such evidence from examination of the record in the instant case.

In front of the jury, Dr. Barrios testified that he knew that oxygen concentration should be no more than 40% in the Isolette, but did not know that long exposure to oxygen could bring an added risk of RLF. He did not think of RLF when he ordered oxygen therapy, but prescribed it to keep the baby alive and to prevent brain and cardiorespiratory damage. He did not know what the average doctor in the community would have done under the circumstances in 1967. But he testified, over objection, that the care and treatment rendered to the Siirila baby were within the standards of practice as they existed in the area in 1967.

duration of oxygen therapy was confirmed. Apparently, "[i]t is now well understood and accepted that the incidence of retrolental fibroplasia will increase with any one of three factors, each of which may act independently:

"1. *Oxygen concentration.* The higher the concentration of the oxygen, the greater the chance of retrolental fibroplasia developing within a given time period. * * * The accepted 'safe' oxygen concentration has been less than 40 per cent, but this must be modified when one considers the variables mentioned below.

"2. *Duration of oxygen treatment.* The longer the continuous oxygen treatment, the greater the chance for retinopathy of prematurity to develop for any fixed oxygen concentration. Thus, six to eight weeks of 40 per cent oxygen therapy may be just as dangerous as three weeks of 60 to 70 per cent.

"3. *Prematurity of the infant.* If both the above variables are held constant, the degree of prematurity becomes important; the smaller the infant, the greater the chance for retrolental fibroplasia.

* * *

"Since there is no treatment for this disease once activity has begun, the physician's major concern must be toward prevention." 148–149, 152.

There was testimony that a premature baby can develop RLF without being given oxygen therapy, and that the Siirila baby suffered damage resulting from environmental difficulties while in his mother's womb.[3]

The jury was instructed that a physician "must possess and exercise that degree of skill and learning which conforms to the average or ordinary learning and skill in his profession in the same or similar communities". Further, they were instructed that Dr. Matthews' testimony was not to be considered in determining the standard of care because he was a specialist and Dr. Barrios was a general practitioner.[4] This was given over the objection of plaintiffs' counsel that such testimony of Dr. Matthews which did not relate to standard of care should have been admissible. Plaintiffs' counsel also maintained that Dr. Matthews testified as to proximate cause and did not testify as to the standard of care. The jury found no cause of action against defendants Dr. Barrios and St. Joseph's Hospital.[5]

The Court of Appeals affirmed, *Siirila v Barrios,* 58 Mich App 721, 723; 228 NW2d 801 (1975). The Court held, first, that as an intermediate appellate court, they were bound by the standard of *Lince v*

[3] One theory presented was that the RLF was caused because the baby's blood vessels were severely immature at the time of birth, and he received lower than normal levels of blood oxygen before he was born. The transfer from a low oxygen content to the 21% oxygen content of ambient air might have caused the constriction of blood vessels which leads to RLF. Testimony at trial was that prenatal problems resulting from abnormal attachment of the placenta and infection of the umbilical cord resulted in lower than normal pre-birth blood oxygen levels.

[4] The testimony of Dr. John Kublin, an ophthalmologist, was also included in this prohibition.

[5] A directed verdict had been rendered in favor of the defendant Air Shields, Inc., manufacturer of the Isolette. Plaintiff moved for voluntary dismissal of defendant Mira Corporation, manufacturer of the oxygen analyzer.

*Monson,* 363 Mich 135, 142–143; 108 NW2d 845 (1961), that there be expert testimony as to the defendant physician's compliance with professional standards and practice in the same and similar communities.[6]

The Court of Appeals specifically refused to apply the same standard of care rule to a general practitioner as would be appropriate for a specialist, "that of a reasonable specialist practicing medicine in the light of present day scientific knowledge. * * * [G]eographical conditions or circumstances control neither the standard of a specialist's care nor the competence of an expert's testimony". *Naccarato v Grob,* 384 Mich 248, 253–254; 180 NW2d 788 (1970). In *Naccarato,* we found it unnecessary to consider whether the locality rule should be modified or abandoned as well for general practitioners. 384 Mich 253.

However, it is the view of a majority of this Court that the issue of applicability of the locality rule was not preserved for appellate review. Plaintiffs' pleadings stated the claim under the "same or similar circumstances" test. Further, counsel never objected to instructions of the court which were couched in these terms. In addition, counsel insisted that the witness's testimony was directed to establishing proximate cause, and not to the question of the appropriate standard of care.

The Court of Appeals also affirmed the trial court's refusal to give plaintiffs a directed verdict.

---

[6] *Lince,* however, referred only to standards of good practice in *the* community, and did not mention that similar communities might also be considered. *E.g.,* 363 Mich 140, 141, 142. However, in *Delahunt v Finton,* 244 Mich 226, 230; 221 NW 168 (1928), quoted in *Lince,* 363 Mich 140–141, the standard was "the practice in that *or* similar communities". (Emphasis added.) This appears to be the correct statement of Michigan law. *E.g., Pelky v Palmer,* 109 Mich 561, 563–564; 67 NW 561 (1896); *Miller v Toles,* 183 Mich 252, 257; 150 NW 118 (1914).

Also approved was Dr. Barrios' testifying that his treatment met community standards. The panel also found the trial judge properly refused to give any instruction on hospital records. 58 Mich App 725–726. The Court of Appeals, however, did not rule on whether a specialist may be permitted to testify as to the standard of care of a general practitioner. We granted leave July 23, 1975. 394 Mich 817.


## II—SPECIALISTS' COMPETENCY TO TESTIFY

The trial judge ruled that Dr. Matthews, a pediatrician, would not be permitted to testify as to the standard of care of defendant general practitioner because Matthews was a specialist. We find the trial judge erred in so ruling without first permitting questioning of Dr. Matthews as to whether he knew the relevant standard of care of a general practitioner.[7] However, since Dr. Matthews admitted he did not know the standards of practice in Houghton-Hancock or similar communities, he would not have been permitted to testify to the standard of care on that basis. Therefore,

---

[7] The trial judge also instructed the jury to disregard the testimony of Dr. John Kublin, an ophthalmologist, as it concerned the standard of care, also because he was a specialist. However, no error was committed as to Dr. Kublin because the opportunity to establish such a foundation was provided:

*Defense Counsel:* "At this time, I don't think Dr. Kublin has testified that he has knowledge that would be deemed in the general practice of medicine other than ophthalmology."

*The Court:* "Mr. Okrent [plaintiffs' counsel]?" Plaintiffs' counsel then attempted to establish whether the medical profession had in 1967 any generally accepted standard for oxygen dosage, but Dr. Kublin did not know that. There appear to have been no other questions directed to the foundational problem, although Dr. Kublin later testified that 40% oxygen was an accepted maximum level to be administered. Since there was an opportunity to do so, and the required competency of witness was not demonstrated, there was no error in the instruction concerning Dr. Kublin.

this was at most harmless error, and the trial court decision should not be disturbed.

Ordinarily, the qualification of competency of expert witnesses is a matter for the discretion of the trial judge, *Ives v Leonard,* 50 Mich 296, 299; 15 NW 463 (1883), "and it is incumbent on the person offering an expert witness to show that the witness possesses the necessary learning, knowledge, skill or practical experience to enable him competently to give such testimony". 11 Michigan Law & Practice, Evidence, § 260, p 484. See *Moore v Lederle Laboratories,* 392 Mich 289, 295–296; 220 NW2d 400 (1974).

Generally, where there are different schools of medical thought, the physician is to be judged by his or her ability to adhere to the requisite standard of care of the school to which he or she adheres. Prosser, Law of Torts (4th ed), p 163. The rationale is that "[p]ractitioners of other schools of treatment, no matter how well qualified by study and experience in their own methods and standards but lacking the requisite knowledge of the specific matter in question [*i.e.,* the ordinary methods and standards of practice of another school], could not competently express opinions". *Bryant v Biggs,* 331 Mich 64, 72; 49 NW2d 63 (1951). However, it is clear that a member of one school of thought may testify as to the standard of care applicable to an individual adhering to another school as long as the proffered witness is familiar with the applicable standards of defendant's school.

"We do not read our precedents to preclude opinion testimony of compliance or failure of compliance with the standards of a defendant's profession except only from a member of that profession. We never have addressed our decisional attention to this specific ques-

tion. However, it is significant that on a number of
occasions in which we have discussed opinion testimony
in malpractice cases, we have suggested that opinions of
one not a practitioner of defendant's profession would
have been admissible had there been a showing that
the offered witness had knowledge of the applicable
standards of the defendant's profession. See, for exam-
ple, *Zoterell v Repp,* 187 Mich 319, 330 [153 NW 692]
(1915); *Sima v Wright,* 268 Mich 352, 356 [256 NW 349]
(1934); *Facer v Lewis,* 326 Mich 702, 713, 714 [40 NW2d
457] (1950); and *Pedler v Emmerson,* 331 Mich 78
(1951)." *Frazier v Hurd,* 380 Mich 291, 297; 157 NW2d
249 (1968).

*Frazier* permitted a medical doctor to testify as
to the standard of care of an osteopathic physician.
See also, *Ferguson v Gonyaw,* 64 Mich App 685,
696; 236 NW2d 543 (1975) (neurosurgeon permitted
to testify as to standard of care of osteopathic
neurosurgeon after qualifying on basis of testi-
mony that medical and osteopathic neurosurgical
procedures were similar); *Pedler v Emmerson,* 331
Mich 78, 80; 49 NW2d 70 (1951) (suggesting that
such knowledge may be demonstrated by factors
including training or experience in the field or
practice of the school about which testimony is to
be received or learning directly from members of
that school what constitutes the standard practice
in the subject treatment).[8]

---

[8] In *Sampson v Veenboer,* 252 Mich 660, 667; 234 NW 170 (1931),
we approved the following qualification of a surgeon from Chicago,
testifying as to the standard of practice of a surgeon in Grand Rapids:
"The defendant testified in his presence that:
" 'There are about 20 fellows of the American College of Surgery in
Grand Rapids. Grand Rapids as a surgical center or locality stands
very high.'
"This in itself would give the witness a good idea of the standard of
surgery in Grand Rapids. After giving these qualifications, the expert
was asked whether he was 'familiar with the standards of surgery of
the average practitioner of surgery in localities and communities
similar to Grand Rapids.' He testified that he was. Thereupon, his
testimony was admitted. The fact that he was a man of experience

Pediatricians and general practitioners are both medical doctors and therefore there is even less reason to preclude testimony of one on the standard of care of the other than there would be if members of different schools were involved. The rule therefore as to the ability of a specialist testifying as to a general practitioner's compliance with the requisite standard of care of a general practitioner is only that the witness have knowledge of the standard of care about which he or she is testifying. The standard of care discussed must of course be that of a general practitioner. See *Czajka v Sadowski,* 243 Mich 21, 22; 219 NW 660 (1928) (testimony of a specialist was deemed improper because it was based on the standards of a skilled specialist). The weight to be given such testimony is, of course, a matter for the jury. *Harvey v Silber,* 300 Mich 510, 517; 2 NW2d 483 (1942).[9]

We are referred to no cases which have changed this rule. *Naccarato v Grob,* 384 Mich 248; 180 NW2d 788 (1970), is inapplicable to this issue because it only dealt with the appropriate standard of care of a specialist. This is not the same as saying that because specialists are subject to a higher standard of care than general practitioners, a specialist may not comment on a general practi-

---

and had performed somewhat similar operations, even though not the identical one in question, and the further fact that it was not shown that this was a very unusual operation, and the further knowledge that he obtained in the court-room listening to defendant's testimony in regard to the practice of surgery in Grand Rapids, were sufficient to qualify him as an expert. The jury was sufficiently informed so as to be able to judge the extent of his qualifications and to decide how much credence should be given to the testimony."

This suggests still another way in which competency may be established.

[9] In *Harvey,* a physician who was only a medical student at the time of a shooting was permitted to testify as to the standard of care of gunshot wounds.

tioner's adherence to his or her own standard, once the specialist demonstrates familiarity with the general practitioner's standard.

Other cases suggested for supporting exclusion of Dr. Matthews' testimony are equally inapposite. Thus, in *Rytkonen v Lojacono,* 269 Mich 270, 273–275; 257 NW 703 (1934), admission of expert testimony was deemed error because the witness failed to testify as to whether the method used by defendant was recognized by other doctors of the vicinity or elsewhere as good practice. He testified instead to methods others actually used. In *Callahan v William Beaumont Hospital,* 67 Mich App 306, 311–312; 240 NW2d 781 (1976), the Court of Appeals held that because defendant specialist was acting as a general practitioner at the time of the disputed treatment, the locality rule prevailed. Therefore, the Court of Appeals held, since the witness had never practiced in the area where treatment was given, his testimony as to defendant's standard of care was properly excluded. Therefore, neither *Rytkonen* nor *Callahan* is on point, and neither *Naccarato* nor these two cases have anything to do with the ability of a specialist to testify as to the standard of care of a general practitioner.

## III—Plaintiffs' Instruction

One more significant matter remains, that is, whether the trial court properly refused to give plaintiffs' proposed instruction: "I charge you, that you may consider as evidence the matters contained in this hospital record, and also concerning the lack or absence of an entry in said hospital record, which should have been entered if such act, occurrence or event had taken place, can be

considered as evidence by you that such act, transaction, occurrence or event had not taken place".

The judge properly denied this request on the basis of Michigan Standard Jury Instructions—Civil, SJI 2.12 "Hospital and Business Records". The SJI provides:

"The committee recommends that no instruction be given concerning hospital and business records.
"Comment
"An instruction on this subject is not necessary and would place undue emphasis upon particular portions of the evidence."

GCR 1963, 516.6(3) requires:

"Where the SJI Committee Report recommends that no instruction be given on a particular matter, the court shall not give an instruction on the matter unless it specifically finds for reasons stated in the record that (a) such an instruction is necessary to state accurately the applicable law and (b) the matter is not adequately covered by other pertinent Standard Jury Instructions."

The problem is that MCLA 600.2146, MSA 27A.2146 provides,

"The lack of an entry regarding any act, transaction, occurrence or event in any writing or record so proved may be received as evidence that no such act, transaction, occurrence or event did, in fact, take place."

Such entries must be "made in the regular course of any business" and it must be

"the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter."

See *People v Kirtdoll,* 391 Mich 370, 386, fn 9; 217 NW2d 37 (1974), for analysis of the use of hospital records.

In construing a predecessor statute,[10] in *Podvin v Eickhorst,* 373 Mich 175, 179–180; 128 NW2d 523 (1964), we held that the statute permitted plaintiff "to use his medical records as evidence not only of the happening of events recorded thereon but he was also entitled to rely upon such records as evidence of the nonoccurrence of certain events in the absence of any record thereof".

Thus, we must reconcile the language of the SJI, and the court rule, and the statute. The court rule mandates an instruction where the SJI recommends none be given only where the applicable law is not otherwise adequately covered. Defendants urge that since the statute says only that lack of an entry *may* be used for a particular purpose, and the evidence was so admitted and argued, an instruction is not necessary.

Defendants are correct. The plain language of the statute says only that the lack of absence of an entry may be "considered as evidence" of the nonoccurrence of particular events. Plaintiffs themselves agree that a significant amount of testimony was devoted to an alleged failure to record information on the infant's charts and records. Further, plaintiffs' counsel told the jury, in his closing argument:

"[W]e have a statute in Michigan * * * that says that a record is admissible not only for the entries that it contains, but for the entries that it doesn't contain. That is, if something should be in the record and isn't there, this is admissible evidence of the fact that it didn't occur."

---

[10] MCLA 617.53; MSA 27.902. The relevant language was identical.

Therefore, the mandate of the statute was complied with. Unlike *Podvin,* the trial judge did not disparage the records in the presence of the jury, 373 Mich 181, and plaintiffs in the instant case thus had the opportunity to have the jury determine the weight and effect of these non-entries. We have been offered no good reason within the guidelines provided by GCR 1963, 516.6(3) to circumvent the express provision of the SJI that no instruction be given. The trial court quite properly refused plaintiffs' request.

Further, it would have been error in any event to give plaintiffs' requested instruction, as it did not state the law accurately. The requested instruction would not have advised the jury that an entry must be made in the regular course of business, and that it must be the regular course of business to make such records.

## IV—CONCLUSION

We reiterate today that a specialist may testify as to the standard of care of a general practitioner as long as the witness is knowledgeable about the general practitioner's standard of care.

As to missing entries in records usually made in the ordinary course of business, the SJI must be followed and the jury may not be instructed, under certain circumstances, that such omissions may be used as evidence that the acts to be recorded did not take place. We find it unnecessary to consider other issues raised by plaintiffs.

The Court of Appeals and the trial court are affirmed. Costs to defendants.

KAVANAGH, C. J., and LEVIN and RYAN, JJ., concurred with WILLIAMS, J.

COLEMAN, J. *(to affirm).* Plaintiff has sued for

damages claiming that his blindness was caused by defendant Barrios' negligence. The jury returned a verdict of no cause of action which the Court of Appeals affirmed.

The appeal to this Court reduces into one viable issue:

Did the trial judge err in refusing to admit into evidence the testimony of an expert witness, a specialist, concerning the standard of care of a general practitioner in Houghton, Michigan· or similar communities?

The testimony was properly rejected in what was an exemplary trial.

Although much has been written in this case about the "locality rule", it is surplusage because the circuit judge did exactly what plaintiff urged in his complaint. The judge instructed the jury to consider the standard of care employed by Dr. Barrios not only in light of the standards of Houghton but also of similar communities. Plaintiff received that for which he asked. We cannot properly make a different case at this level of the proceedings and thereby adopt a new rule to apply to a situation which occurred ten years ago.

The facts of this case are important and all were before the jury. They reveal virtually a miracle not only in saving the life of a baby born after only a little over five months gestation, but also in saving him from brain damage.

Plaintiff was born almost four months prematurely on November 19, 1967 and weighed 950 grams (2 lbs, 1 oz.). His chances of living were one in ten and, if he did live, there was an even chance that some brain damage would result. The mother's prebirth difficulties resulted in the child being starved for oxygen. His exposure to the operating room air doubled his blood oxygen level.

There was testimony that the child probably suffered retrolental fibroplasia (RLF) immediately upon birth and prior to placement in an Isolette.

Dr. Barrios ordered the child placed in an incubator and given oxygen in order for him to survive. He considered it necessary to prevent brain damage or injury to the cardio-respiratory system. His main concern was to keep the child alive:

"*Q.* Doctor, was that your first, your main and your continuing main consideration in your care and treatment of James Siirila?

"*A.* His life.

"*Q.* Doctor, is there ever anything that takes any precedence over life in the care of a child or a person?

"*A.* No.

"*Q.* Doctor, what are the main reasons—causes of death of premature babies?

"*A.* Anoxia. Lack of oxygen.

"*Q.* That comes from what, poor respiratory problems?

"*A.* Yes."

Dr. Barrios visited the child 30 to 45 times during the first two days of his life and checked on him frequently each day after that. He consulted often with his associate, Dr. De Castilla, who had held a residence in pediatric surgery at Children's Hospital in Detroit.

The child was removed from oxygen or the dosage reduced on several occasions without success until December 29 when he was finally removed from the Isolette and returned only as his condition required. On one occasion, the child had been removed from oxygen for seven days but became cyanotic so that he had to be placed back in the oxygen for survival. Removal to another city would have meant almost certain death.

Plaintiff was in the hospital for nearly three months. Following release, his mother noted that plaintiff was not seeing well. Dr. Barrios discovered a scar on the retina and recommended that Dr. Matthews, a Marquette pediatrician, examine the child. This led to an appointment with an opthalmologist and the discovery that plaintiff had retrolental fibroplasia.

At trial, Dr. Matthews was presented as a witness for plaintiff. Defendant objected and the court decided "to prohibit the doctor from testifying as to the standard of care in this community or similar communities on the basis that he's a specialist". Plaintiff did present a Dr. Carson who had practiced in the area since 1952. He said keeping a premature infant under oxygen treatment without regard to retrolental fibroplasia departed from the standard of practice in the area.

Defendant presented Dr. Repola who was on the St. Joseph Hospital staff. He said Dr. Barrios acted according to acceptable standards. He said the child needed "the oxygen to live and so that it won't have brain damage". He believed plaintiff to be one of those premature babies who incur retrolental fibroplasia without ever being treated with oxygen, a result of oxygen starvation in the mother's womb.

The trial judge described Dr. Barrios' duty to plaintiff in this manner:

"You are instructed, members of the jury, that the law requires a doctor to possess and exercise reasonable skill and care in the treatment and care of his patients. Although this requirement does not mean that a physician must possess and exercise the highest degree of learning and skill in his profession, *it does require that he possess and exercise that degree of skill and learning which conforms to the standard of practice in the same*

*or similar communities.* That is, *he must possess and exercise that degree of skill and learning which conforms to the average or ordinary learning and skill in his profession in the same or similar communities.*

"You are further instructed that for you to find that the defendant, Dr. Barrios, in his care and treatment of plaintiff, James Scott Siirila, did not use reasonable skill or care, plaintiff must show by a preponderance of the evidence as follows: One, that defendant doctor did some particular thing or things that a doctor of ordinary skill, care and diligence, in the same or similar community, would not have done under like or similar circumstances. Or, two, that defendant doctor did some particular thing or things in a manner that a doctor of ordinary skill, care and diligence, in the same or similar community, would not have done under like or similar circumstances. Or, three, that defendant doctor failed to do some particular thing or things that a doctor of ordinary skill, care and diligence, in the same or similar community, in the exercise of due care, would not *[sic]* have done under the same or similar circumstances. And, fourth, it must be further shown that such conduct was the proximate cause of the injury suffered." (Emphasis added.)

He also said the jury could not measure "the standards of practice as they affect Dr. Barrios" by holding him "to the standards of board certified pediatricians and opthalmologists".

Plaintiff's complaint said defendant was "under a duty to render care and treatment * * * in accordance with the standard of practice in this and similar communities". The judge instructed the jury that "the law requires a doctor to possess and exercise reasonable skill and care" in treating patients. He must "possess and exercise that degree of skill and learning which conforms to the average or ordinary learning and skill in his profession in the same or similar communities".

These instructions accurately reflect Michigan

precedent. In *Lince v Monson,* 363 Mich 135, 140–141; 108 NW2d 845 (1961), the Court used this standard:

"In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities." *Delahunt v Finton,* 244 Mich 226, 229, 230; 221 NW 168 (1928).

*Skeffington v Bradley,* 366 Mich 552, 554; 115 NW2d 303 (1962), followed *Lince* in requiring that there be medical testimony "showing or tending to show that what the defendant did or omitted doing was contrary to customary practice by reputable members of the medical profession practicing under similar conditions". Also see *Wrobel v Cotman,* 372 Mich 383; 126 NW2d 723 (1964), *Daniel v McNamara,* 10 Mich App 299; 159 NW2d 339 (1968), and *Mitz v Stern,* 27 Mich App 459; 183 NW2d 608 (1970).

The jury was properly instructed on Dr. Barrios' duty to plaintiff. The remaining question is whether the jury should have been permitted to consider the testimony of two specialists in measuring the standard of practice. The trial judge correctly refused to permit this.

In *Naccarato v Grob,* 384 Mich 248, 252; 180 NW2d 788 (1970), plaintiff sued two Detroit pediatricians for failing to diagnose a certain disease. Plaintiff's experts were from Chicago and Los Angeles; defendants' were from Detroit. The jury returned a verdict for plaintiff. The trial judge overturned this because "the testimony of the plaintiff's experts could not be considered by the

jury as worthy of belief regarding the standards of actual private practice of the physicians in the Detroit area during the time periods in question".

In reinstating the verdict, this Court relied on *Wood v Vroman,* 215 Mich 449, 465, 466; 184 NW 520 (1921), which said a specialist is "obligated to bring to the discharge of his duty that degree of skill and knowledge possessed by physicians who are specialists in the light of present day scientific knowledge". This Court then said:

"The reliance of the public upon the skills of a specialist and the wealth and sources of his knowledge are not limited to the geographic area in which he practices. Rather his knowledge is a speciality. He specializes so that he may keep abreast. Any other standard for a specialist would negate the fundamental expectations and purpose of a speciality. The standard of care for a specialist should be that of a reasonable specialist practicing medicine in the light of present day scientific knowledge. Therefore, geographical conditions or circumstances control neither the standard of a specialist's care nor the competence of an expert's testimony."

Dr. Barrios did not hold himself out as a specialist. He should not be judged by a specialist's standards.

In *Rytkonen v Lojacono,* 269 Mich 270, 274; 257 NW 703 (1934), plaintiff's husband had died following surgery. One allegation was that defendant had failed to properly secure a tube which slipped inside the husband's body. The man who performed the autopsy, Dr. Talso, was permitted to testify how he would have secured the tube and about practices he had observed at famous hospitals:

"Dr. Talso's testimony in this respect was error.

Defendant is not to be charged with the peculiar skill or methods of practice used in famous medical institutions. Nor is the treatment another physician would have used under the circumstances the test. *Wood v Vroman,* 215 Mich 449, 465. The rule is firmly established that defendant was bound to use the degree of diligence and skill which is ordinarily possessed by the average of the members of the profession in similar localities. *Miller v Toles,* 183 Mich 252; LRA 1915C, 595 [150 NW 118 (1914)]; *Czajka v Sadowski,* 243 Mich 21 [219 NW 660 (1928)]. Dr. Talso's testimony was not cured by a general statement that his methods have been used by physicians in the same and similar communities. He did not say other methods were not recognized as proper."

One defendant in *Callahan v Beaumont Hosp,* 67 Mich App 306, 310; 240 NW2d 781 (1976) (a surgeon named Feldstein), had treated plaintiff in the emergency room for an ankle injury. The Court said *Naccarato* "was grounded to a large degree on the reliance and expectations of the public with respect to the skills possessed by a specialist". A specialist "represents to the public that he has special knowledge and skills not possessed by a general practitioner and that he also keeps abreast with the advances in his specialty".

Plaintiff's expert witness was a surgeon. The trial judge refused to let him testify as to the standards of care to be imposed on the defendant. In affirming, the Court of Appeals said:

"Dr. Feldstein, although a surgeon, was not practicing surgery or utilizing any special skills of a surgeon when he treated the plaintiff. Rather, in wrapping the plaintiff's ankle in an Ace bandage and telling her to take aspirin for the pain, Dr. Feldstein was acting in the same manner as would any other doctor on duty at the emergency room of the defendant hospital. Furthermore, the injury suffered by the plaintiff was not an

injury requiring treatment by a surgeon, nor is there any indication that the knowledge and skills that Dr. Feldstein gained by virtue of his specialization in any way better prepared him to examine and treat the plaintiff's injury. Under these circumstances, there is no holding out of special skills or knowledge on the part of Dr. Feldstein, nor is there any reliance upon such special skills or knowledge by the plaintiff. As a result, we decline to extend the holding of the *Naccarato* decision to the facts of the present case, since the rationale underlying that decision has no application here."[1]

The defendant was held to " 'that degree of skill and diligence ordinarily exercised by the average members of the medical profession in the same or similar localities with due consideration to the state of the profession at the time' ".

We agree with Justice WILLIAMS that "a general practitioner is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class, acting under the same or similar circumstances". However, his extended discussion of the "locality rule" is unnecessary and diverting. As demonstrated above, a doctor's conduct is to be measured against the degree of skill and learning expected of reputable doctors practicing under similar conditions. We do not limit consideration to the particular locality

[1] The Court also noted these factors:

"Moreover, this case involves treatment in the emergency room of a large metropolitan hospital. It is entirely possible that the conditions present in an emergency room of a Detroit area hospital are so different from those in an emergency room of a small-town hospital, that any comparisons made by a small-town doctor would be unfair to a doctor practicing in the big-city hospital. It is also possible that the number of cases handled in the emergency room of a big-city hospital as well as the nature of those cases may differ so significantly from the nature and volume of cases handled in the emergency room of a small-town hospital that comparisons of the procedures used in each to examine a person seeking emergency treatment would be misleading."

but include similar communities. We require that the doctor's actions conform to customary practice of the medical profession. There is nothing impermissibly parochial or restrictive about the Michigan standard. It states a reasonable method by which to judge the doctor's conduct. The trial judge followed the law.

Justice Williams concludes that reversible error occurred when the jury was told that the specialist's testimony could not be used to judge Dr. Barrios' conduct. I disagree. This would be a new rule of law which would inure to the benefit of no one.

Expert witnesses are used to assist the jury in determining by what standards the defendant's conduct should be examined. Dr. Barrios held himself out as a general practitioner. He did not claim to be a specialist; he should not be judged by their standards. The specialist's testimony was heard by the jury and was excluded *only* to the extent that the jury could not use it to measure "the standards of practice as they affect Dr. Barrios". The case was fully and properly presented to the jury and its verdict should stand. We should not act as a superior, if remote, second jury.

This is a very difficult case because one of the principals was an infant. It is natural to feel deep sadness for the child and family. Undoubtedly the jurors were similarly moved. However, from the evidence presented, they may have concluded that without Dr. Barrios' efforts James Siirila would not have lived at all. Also, from the fully developed evidence they could not fix blame for the sight problem upon defendant doctor. This was an emergency situation demanding that tough decisions be made. Dr. Barrios' main concerns were preserving life and preventing brain damage.

There was testimony that the sight damage probably took place because of the lack of oxygen in the mother's womb. The jury heard all the facts in 17 days of testimony and found that Dr. Barrios had not violated his duty.

Included in the testimony was a cross-examination of Dr. Barrios concerning the fact that he "didn't seek any advice from any pediatrician 100 miles away by picking up a telephone to say to him * * * are there any special problems, things that I should be looking out for?" Dr. Barrios made the point that he "was treating jointly this patient with Dr. De Castilla * * * [who] had experience in pediatrics". He said:

"I knew there was going to be problems, but in my judgment, the child started doing well, and any transfer or any change of what has been established, you know, or a nursery, would be detrimental to the baby."

The jury thus had available testimony concerning whether Dr. Barrios should have called Marquette for advice. It is not proper for us, by hindsight, to say that the jury should have concluded other than as they did. They had the information which my colleague argues they should have had.

Unfortunately, we cannot bring back plaintiff's sight. Neither can we in good conscience affix blame on Dr. Barrios in a suit charging medical malpractice where the jury found none.

Importantly, we should limit ourselves to the only real issue before us: the propriety of admitting the expert testimony of the Marquette specialist Dr. Matthews regarding the standard of medical care by general practitioners in Houghton or similar communities.

We would not adopt the new rules proposed and

cause them to be applicable to facts which occurred ten years ago.

Affirm.

FITZGERALD and LINDEMER, JJ., concurred with COLEMAN, J.

WILLIAMS, J. *(to concur).* We originally granted leave to appeal in this case to consider whether the standard of care for general practitioners should be judged by the practice in the same or similar communities. Counsel for the defense has cogently argued that the issue of the viability of the locality rule as a measure of the standard of care of general practitioners was not preserved for review. He accurately pointed out that plaintiffs' complaint alleged that Dr. Barrios had violated the standard of care of the same or similar communities, and that no instruction was ever requested which would require a different standard of care.

This is indeed correct. However, both before the Court of Appeals and our Court, the parties treated the locality rule as the salient problem and indeed the decision of the Court of Appeals was directed almost exclusively to this question. Therefore, the issue has received the benefit of extensive discussion and the parties have had an opportunity to be heard on the issue. All the facts relevant to appellate determination were developed at trial. Further, this is not a case where the trial judge might have cured an error if an objection were raised or if an instruction were requested, inasmuch as the trial judge had volunteered, when the question of standard of care was first raised, "this Court is not going to venture into a new realm of law".

It is apparent that objections or requests for

instructions based on a new legal theory would have been fruitless in that context. There is nothing to be gained by requiring parties to engage in exercises in futility in order to benefit from the appellate process.[1]

Further, our state has adopted a liberal approach to the amendment of pleadings, "when justice so requires", even after judgment. GCR 1963, 118. The ability to grant leave for such revisions is not limited to the trial court, but may be exercised by the Court of Appeals, GCR 1963, 820.1(1) and by our Court, GCR 1963, 865.1(1). Even in this case, sufficient evidence was introduced on the standard of care, albeit by the back door as counsel suggested the testimony was entered on the basis of proximate cause, to permit such amendment.

In addition, had plaintiff pled his case to indicate the standard of care allegedly violated by defendant was not that of the same or similar communities, it is likely he would have had to amend them to conform to the existing law anyway, in order to get into court. Had he chosen instead to appeal on the issue of the pleadings, this would have meant further delay in bringing the matter to trial, and would have required the appellate court to review the issue without the advantages of full development of facts now here before us. In our zeal to adhere to technical re-

---

[1] Arguably, there was sufficient objection made to preserve the issue. The court held: "I'm going to prohibit the doctor [Matthews] from testifying as to the standard of care in this community or similar communities on the basis that he's a specialist". This reason is ambiguous as to whether he would not permit testimony as to the proper standard of care or would not permit a specialist to testify about a general practitioner or both. Counsel for one of the parties defendant objected to this ruling and apparently covered all possible interpretations. "I object to the court limiting Dr. Matthews' testimony as to what the standard of care of general practitioners in other similar communities might be."

quirements, we should not forget that plaintiffs do not file cases to have to appeal them, and parties, if at all possible, do not structure their cases to require a statement of new law before they can be heard. To now require that pleadings restrict the scope of appellate review would be contrary to the spirit if not the letter of our own court rules.

Therefore, this case falls within that class in which this Court has not hesitated to review an issue which may not have been clearly presented or preserved below.

"The general rule that a question may not be raised for the first time on appeal to this Court[2] is not inflexible * * * . When consideration of a claim sought to be raised is necessary to a proper determination of a case, such rule will not be applied." *Prudential Life Insurance Co v Cusick,* 369 Mich 269, 283, 290; 120 NW2d 1 (1963), quoting *Dation v Ford Motor Co,* 314 Mich 152, 160; 22 NW2d 252 (1946).[3]

The "issue has been adequately presented and briefed", *Perin v Peuler,* 373 Mich 531, 534–535; 130 NW2d 4 (1964), and "the record is complete so that the taking of further testimony is not required for the determination of the question". *Meek v Wilson,* 283 Mich 679, 689; 278 NW 731 (1938). "[T]he question is one of law, and all of the facts necessary for its resolution have been presented." *Kahn-Reiss, Inc. v Detroit & Northern Savings & Loan Association,* 59 Mich App 1, 12; 228 NW2d 816 (1975).

"[T]his Court * * * has often asserted the right

---

[2] Here, of course, the issue was raised in the Court of Appeals.

[3] *Prudential* was a case in equity, although the Court made it clear the principle applied equally to law cases and the review of administrative decisions. We also noted, when the question of lack of objection was raised, "Granted, and what of it, even though counsel may snore steadily at the table assigned to them?" 369 Mich 289.

to consider manifest and serious errors although objection was not made by the party who appeals." *People v Dorrikas,* 354 Mich 303, 316; 92 NW2d 305 (1958). This is but one reason for our Court so acting, and such review has been extended in both civil and criminal cases. *People v Snow,* 386 Mich 586, 591; 194 NW2d 314 (1972).

We therefore proceed to the merits.

The important question in this case is whether Michigan should adopt, as a number of jurisdictions already have adopted, a rule for the standard of care of a general practitioner in keeping with the realities of the day and the high standards of the medical profession. The old rule is that the general practitioner must adhere to the standard of care in the same or similar communities. We would follow the lead of other jurisdictions and reject this approach.

We would hold that the test in Michigan henceforth shall be that a general practitioner is under duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class, acting under the same or similar circumstances, having in mind (a) the state of the art for the particular medical situation, (b) whether a specialist should reasonably have been consulted and (c) such local factors as might be pertinent.

## I—THE REASON FOR THE LOCALITY RULE v MEDICAL PROGRESS

Except for rare cases in which the facts may be understood by nonmedical personnel, *Lince v Monson,* 363 Mich 135, 141; 108 NW2d 845 (1961), it is the general rule that a case of medical malpractice as opposed to other negligence may not be estab-

lished without expert testimony "of those learned in such matters". *Zoterell v Repp,* 187 Mich 319, 330; 153 NW 692 (1915); *Wood v Barker,* 49 Mich 295, 298–299; 13 NW 597 (1882). Such testimony has generally been required to show that what the defendant general practitioner did "was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities".[4] *Delahunt v Finton,* 244 Mich 226, 360; 221 NW 168 (1928). *Winchester v Meads,* 372 Mich 593, 598; 127 NW2d 337 (1964).

It has been observed that the locality rule "is a doctrine peculiar to American law", Comment, *Standard of Care for Medical Practitioners—Abandonment of the Locality Rule,* 60 Ky LJ 209, 210 (1971), with its origin in the vast distances characteristic of our country and the apparent differences between urban and rural practice in the 19th century.

First introduced in 1870 in Kansas, the locality rule mandated that a physician in a rural area should not be held to the same standard of care as one in a larger metropolitan area. The Court reasoned that in the latter situation there is a greater opportunity to perform and observe surgical procedures and treat more types of diseases. *Tefft v Wilcox,* 6 Kan 46 (1870), cited in Recent

---

[4] The most narrow formulation of this doctrine requires the physician to adhere to that standard characteristic of the *same* community in which he or she practices. *E.g., Force v Gregory,* 63 Conn 167; 27 A 1116 (1893), cited at 60 Ky LJ 210, fn 3. This approach was rejected in our state in *Pelky v Palmer,* 109 Mich 561, 564; 67 NW 561 (1896). The rule fell into disrepute because of the difficulty of finding qualified physicians willing to testify in a case in which a neighbor physician was defendant, and also because of courts' reluctance to permit a small group of doctors to establish an "inferior local standard of care". Nevertheless, the rule remains viable in some jurisdictions. Note, *An Evaluation of Changes in the Medical Standard of Care,* 23 Vand L Rev 729, 731 (1970).

Decisions, *Torts—Willingness to Abrogate the Locality Rule in Medical Malpractice Suits Indicated,* 43 Miss LJ 587, 588 (1972).

The rationale was accepted in *Small v Howard,* 128 Mass 131, 136; 35 Am R 363 (1880), emphasizing that the physician in "a small country village" would seldom be required to perform difficult operations. Further justification for applying a different standard appeared in a Kentucky court's observation that since the most talented physicians would turn to the more lucrative cities for employment, "the practitioners in rural localities have not the same high degree of skill, or knowledge, or education that may be found in large cities and populous communities". *Burk v Foster,* 114 Ky 20, 25; 69 SW 1096, 1097 (1902).

In most states some form of the locality rule still exists. *E.g., Bailey v Williams,* 189 Neb 484, 486; 203 NW2d 454, 456 (1973); *Goedecke v Price,* 19 Ariz App 320, 322; 506 P2d 1105, 1107 (1973); *Horton v Vickers,* 142 Conn 105, 113; 111 A2d 675, 679 (1955). See 60 Ky LJ 209; Note, *Negligence—Medical Malpractice—The Locality Rule,* 18 DePaul L Rev 328, 332, fns 13, 14 (1968); Restatement Torts (2d), § 299A.

However, the rule has been subjected to both intensive criticism and extensive change, reflecting progress in technology and communication, and changing attitudes of the medical profession itself.

Perhaps one of the earliest decisions rejecting dogmatic application of the rule was *Viita v Dolan,* 132 Minn 128, 136–137; 155 NW 1077, 1081 (1916). Although unique at the time, its affirmation of an instruction holding locality of the defendant physician as only "among the circumstances to be considered" in evaluating the physician's conduct has proved to be a bellwether of modern reasoning.

The court observed that the physician or surgeon in a village receives ample opportunity for advancement with the work of medical societies, journals, books and experience in hospital work putting "the country doctor on more equal terms with his city brother. He would probably resent an imputation that he possessed less skill than the average physician or surgeon in the large cities." 132 Minn 137; 155 NW 1081.

It is evident that today's physician operates within a milieu in which the "coach and four", *Wiggins v Piver,* 276 NC 134, 140; 171 SE2d 393, 396 (1970), has been replaced by sophisticated communication and improved transportation. "[M]edical journals, closed circuit television presentations, special radio networks for doctors, tape recorded digests of medical literature, and current correspondence courses", 23 Vand L Rev 732, are not uncommon.[5]

All licensed physicians meet minimum standards required by state licensing boards.[6] The increasing excellence of medical schools and the free interchange of scientific information have a "consequent tendency to harmonize medical standards throughout the country". *Cook v Lichtblau,* 144 So 2d 312, 315 (Fla App, 1962), quoting *Montgomery v Stary,* 84 So 2d 34, 39 (Fla, 1955).

Development of the locality rule preceded accreditation of medical schools, which began in 1906 under the AMA Council on Medical Education. Since 1942, such accreditation has been controlled by the national AMA Liaison Committee

---

[5] The Medical College of Alabama provides a 24-hour switchboard service through which the calling doctor can be connected with a staff specialist. 23 Vand L Rev 732.

[6] Of course, certification may be obtained by specialists in their particular disciplines only after specific minimum *national* standards are met. 43 Miss L J 590–591.

on Medical Education and the Association of American Medical Colleges. In 1907 there were 160 medical schools and only 82 were graded acceptable. Compare this to the 1968–69 record of 99 medical schools, with 85 fully accredited four-year schools granting the MD degree; 6 accredited two-year schools of basic medical sciences; and 8 under development. 23 Vand L Rev 733, fn 17.

"The 'locality rule' (never recognized in England) had its origin in the very old and far away days when there were many little institutions which called themselves medical schools. Students were admitted who could show a high school diploma or furnish a certificate from a school principal that the bearer had completed the 'equivalent' of a high school course of study. At the end of the course, he was given an M.D. degree. Passing the licensing board was in the nature of a formality. In many rural communities, ever thereafter the doctor was on his own. Frequent refresher courses, now generally attended, were unknown." *Wiggins v Piver,* 276 NC 134, 139; 171 SE2d 393, 396 (1970).

It was even recognized early that certain procedures, such as the application of plaster casts and the treatment of fractures, should not materially differ from locality to locality, *Geraty v Kaufman,* 115 Conn 563, 574; 162 A 33, 37 (1932), or even from nation to nation. *Lewis v Johnson,* 12 Cal 2d 558, 561; 86 P2d 99, 101 (1939). *Riley v Layton,* 329 F2d 53, 57 (CA 10, 1964); *Murphy v Little,* 112 Ga App 517, 523; 145 SE2d 760, 764 (1965).[7]

Uniform and improved levels of medical practices must inevitably result from the encouragement of continuing medical education, the prevalence of regional medical centers, standardization

[7] The same principle has been applied to X-ray treatment, *McElroy v Frost,* 268 P2d 273, 279–280 (Okla, 1954), and to cataract operations, *Hundley v Martinez,* 151 W Va 977, 995; 158 SE2d 159, 169 (1967).

and excellence of modern medical schools[8] and training, the dissemination of reports via journals, and instant communication devices. These trends are particularly applicable to general practitioners, as well summarized in the Stanford Law Review:

"The American Medical Association studied the extent of postgraduate medical education in the United States. The results of the study were published in a series of articles in the *Journal of the American Medical Association* beginning February 26, 1955. Results showed physicians spend on the average 83 days of such study each year. In 1961, 1,105 courses in continuing medical education were offered to physicians; 52% were designed for general practitioners; 35% for specialists, and 13% for both. Parke, Davis & Co., Patterns of Disease 2 (March, 1962). Of 20,432 physicians enrolled in 695 courses in 1956–57, almost one-third traveled 50 to 200 miles to the course center. *Ibid.* Moreover, since its founding in 1947, the American Academy of General Practice has required postgraduate medical education for continuing membership. American Academy of General Practice, 22 Questions and Answers (1961). The present membership of the Academy is approximately 27,000. *Ibid.* The present requirement is 150 hours of postgraduate medical education every three years. See American Academy of General Practice, Academy Postgraduate Study Requirements Continuing Education (Nov, 1961). Apparently no American Specialty Board or specialty society requires postcertification medical education.

"G P, the monthly publication of the Academy, had subscriptions of 13,058 in 1950 and 69,838 in 1961. See Questionnaire From the American Academy of General

[8] "[T]he qualifications of a physician and surgeon to practice in California does not depend upon the locality in which he is engaged in practice, but upon the education and training which he has received in institutions in which the method and scope of instruction and the technique in training are substantially uniform." *Sinz v Owens,* 33 Cal 2d 749, 767; 205 P2d 3, 13 (1949) (Carter, J., dissenting).

Practice to the *Stanford Law Review.* The weekly publication of the American Medical Association, AMAJ had subscriptions of 134,572 in 1950 and 185,654 in 1961. See Questionnaire From the American Medical Association to the *Stanford Law Review.*

"An example of a major change in the communication of medical knowledge is Mediphone, a service center which dispenses emergency drug information by phone to any of its over 200,000 physician subscribers." Recent Development, *Medical Specialties and the Locality Rule,* 14 Stanford L Rev 884, fns 12, 21 (1962).

Currently, an increasing number of general practitioners, or family physicians, take an examination every six years to become or remain certified as diplomates of the American Board of Family Practice. These physicians are also required to take 50 hours of continuing education each year in order to keep up with new developments. Approximately 60 percent of the examination questions concern medical knowledge or techniques not well known six to ten years ago. This is the first specialty to recognize mandatory recertification of its members and, pertinent to the issue at bar, the requirements do not vary with the physician's community. Thus, it is apparent the general practitioner has been in advance of our courts in recognizing the professional obligation to keep current. Detroit Free Press, *GPs Keeping Up? Test Requires Them To* (November 1, 1976), p 1-D.

## II—NEW APPROACHES TO THE RULE

Other courts have recognized these changes by acknowledging the artificiality of the concept of the locality rule defining a general practitioner's universe.

One approach has been to ignore geographical boundaries and to look instead to the medical

locality as the relevant area.[9] Thus, courts adopting this rule have tended to consider the proximity and accessibility of medical factors such as schools, hospitals and research, teaching and laboratory facilities in the localities compared. *Tvedt v Haugen,* 70 ND 338, 349; 294 NW 183, 188 (1940) (defendant physician's lack of an adequate X-ray machine was not an excuse where he was familiar with and had access to more expert advice and facilities in nearby towns); *Flock v J C Palumbo Fruit Co,* 63 Idaho 220, 236–238; 118 P2d 707, 714–715 (1941); *Hodgson v Bigelow,* 335 Pa 497, 518; 7 A2d 338, 348 (1939) (X-ray machines must be available if defendant is to be liable for a failure to use one).

This, however, only partially rectifies the problem, and, after reviewing the same sort of evidence of improved communication and technology, still other courts have determined that the appropriate approach is not to re-interpret the locality rule, but to eschew strict adherence to it. Thus, declaring that "[t]he time has come when the medical profession should not longer be Balkanized by the application of varying geographic standards in

---

[9] Less desirable means of defining locality, such as socio-economic factors or geographical proximity, Note, *Torts—Medical Malpractice —Michigan Abandons Locality Rule with Regard to Specialists,* 40 Fordham L Rev 435, 439 (1971), did not focus on the rationale behind adoption of the locality rule, *i.e.,* the physician's opportunity to become aware of advances in medicine, such as opportunities for continuing medical education, for observation and practice of advanced medical techniques, and for access to modern facilities, advantages considered to be denied to the rural practitioner.

"The rule served to protect the rural practitioner whose access to technical and professional advances was severely restricted." Recent Development, *Torts—Medical Malpractice: Expanded Standards of Care for Washington Physicians, Dentists and Hospitals,* 44 Wash L Rev 505, 508 (1969).

*See, e.g., Smothers v Hanks,* 34 Iowa 286, 290; 11 Am R 141 (1872); *Tefft v Wilcox,* 6 Kan 46, 63–64 (1870); *Gramm v Boener,* 56 Ind 497 (1877). All approaches, of course, appear to ignore the question of how "similar" localities must be.

malpractice cases", the Supreme Judicial Court of
Massachusetts overruled *Small v Howard, supra,*
and established a new rule in *Brune v Belinkoff,*
354 Mass 102, 108–109; 235 NE2d 793, 798 (1968)
(emphasis by the Court).

"The proper standard is whether the physician, if a
general practitioner, has exercised the degree of care
and skill of the average qualified practitioner, taking
into account the advances in the profession. In applying
this standard it is permissible to consider the medical
resources available to the physician as *one* circum-
stance in determining the skill and care required. Un-
der this standard some allowance is thus made for the
type of community in which the physician carries on
his practice."

A similar approach was adopted in the state of
Washington, where the Supreme Court found the
locality rule

"has no present-day vitality except that it may be
considered as *one* of the elements to determine the
degree of care and skill which is to be expected of the
average practitioner of the class to which he belongs.
The degree of care which must be observed is, of course,
that of an average, competent practitioner acting in the
same or similar circumstances. * * * [L]ocal practice
within geographic proximity is one, but not the only
factor to be considered. * * *

"[The] standard of care is that established in an area
coextensive with the medical and professional means
available in those centers that are readily accessible for
appropriate treatment of the patient." *Pederson v Du-
mouchel,* 72 Wash 2d 73, 79; 431 P2d 973, 978 (1967)
(emphasis by the Court).

Accord, *Shier v Freedman,* 58 Wis 2d 269, 283–284;
206 NW2d 166, 171 (1973).

With minor changes, the Washington method

has been adopted by Kentucky. That Court substituted the term "reasonably competent" for the Washington Court's "average", thus requiring a jury instruction that "the defendant was under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances". *Blair v Eblen,* 461 SW2d 370, 373 (Ky, 1970).

Arguing that "we will not perpetuate a rule designed to protect country doctors in 1902, but we will leave determination of the standard to the medical profession and not the lay courts", the Kentucky Court decreed that "evidence may include the elements of locality, availability of facilities, specialization or general practice, proximity of specialists and special facilities as well as other relevant considerations". 461 SW2d 373.

### III—THE RESTATEMENT COMMENT

Perhaps the most significant bastion of the locality rule remains the Restatement. However, even there, the concept is not written in stone. It did not appear in the first Restatement Torts, § 299, comment d, where the standard was: "In those professions which can be practiced only by persons who have been trained thereto, one * * * is required to have the skill normal to the average member of the profession". This did not limit the required skill to that in the same or like localities. That requisite was added by the Second Restatement Torts, § 299A:

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by

members of that profession or trade in good standing in similar communities."

In comment g, the Reporter indicates geographical location, size, and the character of the community in general are factors to consider.

As the *Blair* opinion noted, although still retained by the Restatement, the " 'community standard' rule in these cases is being steadily rejected". 461 SW2d 373.

Dean Prosser, the Restatement Reporter, has himself observed that this locality rule is falling into disfavor, and that such rejection is justified.

"Formerly it was generally held that allowance must be made for the type of community in which the physician carries on his practice, and for the fact, for example, that a country doctor could not be expected to have the equipment, facilities, libraries, contacts, opportunities for learning, or experience afforded by large cities. Since the standard of the 'same locality' was obviously too narrow, this was commonly stated as that of 'similar localities,' thus including other towns of the same general type. Improved facilities of communication, available medical literature, consultation and the like, led gradually to the abandonment of any fixed rule, and to treating the community as merely one factor to be taken into account in applying the general professional standard. In a few jurisdictions the 'locality rule' has been entirely discarded, and the general standard applied in all cases." Prosser, Handbook of Torts (4th ed), ch 5, p 164.

The Restatement has never been the basis of the Michigan rule.[10] Instead, we have, first, based our

---

[10] Further indication that our state's interpretation of the locality rule has never relied on the Restatement is seen in the fact that its standard has never been applied in our state to such professions as attorney or accountant, although the Restatement suggests this would be appropriate.

formulation of the appropriate standard of care for physicians on the same technological and communication problems which troubled other courts. Then, we have emphasized that geography itself should not alone be determinative.

## IV—Michigan and the Locality Rule

Michigan has followed the locality rule but recognizes at least two modifications. First, the physician must conduct his or her practice in conformity with the state of the art. And second, the general practitioner is expected to know within reason when a medical problem requires consultation with a specialist.

The locality rule was clarified in our state initially in *Pelky v Palmer,* 109 Mich 561, 564; 67 NW 561 (1896), where we held it was incorrect to limit the standard to a particular locality or neighborhood.[11] Thus, the basic Michigan standard is the practice in the same *or* similar communities.

*Pelky* did several other things. First, it expressed a rationale for the rule, "that a surgeon's skill depends somewhat upon his experience and opportunity for witnessing operations, and it is to be expected that the degrees of surgical skill met with in different localities will be affected by these things." 109 Mich 563.[12] However, *Pelky* also made

---

[11] We accepted an instruction in *Pelky,* which referred to "the ordinary judgment of physicians in his neighborhood," because the language, while "perhaps not strictly accurate", was valid "in view of the testimony showing that the defendant resided in one of the cities of the State, where, as the evidence shows, there are other physicians, presumably of average ability when compared with similar localities". 109 Mich 563.

[12] Although the action in *Pelky* was against a surgeon, and this quoted language refers to surgeons, it is clear both from the court's instruction and the trend in all our cases until *Naccarato v Grob,* 384 Mich 248, 254; 180 NW2d 788 (1970), that general practitioners and specialists such as surgeons were treated identically, as far as the appropriate standard of care was concerned.

it clear that the locality rule could not be construed to excuse incompetence, using this as one reason to reject the "same locality" requirement. "[A] man with no skill, or inconsiderable skill, could not shelter himself behind the claim that he was the only practitioner in his neighborhood, and therefore that he was possessed of the ordinary skill required, although shown to possess less than the ordinary skill to be met with in such localities." 109 Mich 563. The opinion also suggested that geography alone would not determine the appropriate standard, for we said, "the character of the locality has *an important bearing* upon the degree [of skill] requisite." 109 Mich 563 (emphasis added).

This flexible approach by our Court is also seen by our definition of locality. Rejecting a strict geographical concept, in determining the competency of experts to testify we have tended to find localities similar if we find, for example, similar medical facilities in the localities compared. *Sampson v Veenboer,* 252 Mich 660, 667; 234 NW 170 (1931).[13] Our rationale for so doing is similar to the one expressed in *Pelky,* in that we made it clear that the locality should never be construed to make it impossible for plaintiffs to bring a cause of action against a truly negligent physician.

"At times it may become necessary to secure the expert testimony of one who resides some distance from the home of a defendant accused of malpractice, for it may be difficult to obtain a witness to testify against one who bears the very high professional reputation of defendant. If it would always be necessary to secure an

---

[13] Although *Sampson* involved surgery, we did not base our decision on a concept of the standard of care for specialists, but rather we permitted a Chicago surgeon to testify about surgery in Grand Rapids because of the high quality of Grand Rapids as a surgical center. 252 Mich 660, 667.

expert from the vicinity of the home of a defendant who might be the only practitioner there, it would be impossible to secure such testimony at all. What credence should be given to the expert's statements is another matter. That was the province of the jury." 252 Mich 667.

So much for the locality part of the rule. As for the state of the art modification, we have emphasized that the physician's skill must be exercised in the light of present-day scientific knowledge. *Wood v Vroman,* 215 Mich 449, 465–466; 184 NW 520 (1921). Although *Wood* dealt with specialists, in other cases we have said that specialists are not the only ones required to keep up. See *Hitchcock v Burgett,* 38 Mich 501, 512 (1878) ("[T]he advanced state of the profession[s] [physicians and surgeons] should be considered"); *Miller v Toles,* 183 Mich 252, 257; 150 NW 118 (1914) ("[D]ue consideration [must be given] to the state of the art at the time").[14]

As for consultation with specialists, in *Morgan v Engles,* 372 Mich 514, 516; 127 NW2d 382 (1964), we recognized that a general practitioner is not serving the public with due care, even if the medical problem is beyond the capabilities of a

---

[14] This is generally the case in other states, and nowhere is this limited to specialists. "The physician or surgeon who assumes to exercise the healing art, is bound to be up to the improvements of the day." *Hodgson v Bigelow,* 335 Pa 497, 505; 7 A2d 338, 342 (1939), quoting *McCandless v McWha,* 22 Pa 261, 269 (1853). "Physicians are required to keep abreast of and use the best modern methods of treatment, and in so doing they may not unduly and narrowly restrict or confine their responsibility to the immediate place where they are practicing." *Flock v J C Palumbo Fruit Co,* 63 Idaho 220, 236; 118 P2d 707, 714 (1941).

"The degree of skill and knowledge that must be possessed is measured by the present state of medical science. Outmoded methods, although once acceptable, may constitute negligence as measured by current standards. The physician is required to keep abreast of current trends in medicine." Note, *Civil Liability of Physicians and Surgeons for Malpractice,* 35 Minn L Rev 186, 188–189 (1951).

practitioner in the same or similar localities, if the practitioner reasonably should have understood that diagnosis or treatment was beyond his or her skills and that the patient should have been referred to a specialist.

"The rule is summed up in the annotation entitled 'Duty of physician or surgeon to advise patient of the possibility or probability of better results from treatment by specialist or by a mode of treatment which he is not qualified to give.' 132 ALR 392. It reads as follows:
" 'It may be stated as a general rule that, as a part of the requirements which the law exacts of general practitioners of medicine and surgery, or other schools of healing, if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the situation to his patient, or advise him of the necessity of other or different treatment.' Citing *Janssen v Mulder,* 232 Mich 183 (25 NCCA 248) [205 NW 159 (1925)], among other cases."

Thus, it is apparent that while this Court has recognized the locality rule, it has insisted that the state of the art be kept in mind and that inadequate service in a locality is not excusable if the practitioner should have reasonably referred the case to a specialist.

## V—A BETTER RULE FOR TODAY

We are persuaded that the factors we have reviewed—rapid methods of transportation, easy means of communication, the efforts of the medical profession itself to disseminate the latest advances, as well as the obligation of any professional to

keep abreast of such progress—have rendered obsolete the reasons for maintaining greater emphasis on geography rather than on the state of the art.

Further, there have been sufficient problems with the old emphasis to encourage us to look for suitable alternatives. Stressing geography has at least the potential effect of insulating pockets of substandard medical practice[15] and of severely restricting the pool of available expert witnesses,[16] essential participants in most malpractice cases. Furthermore, "this Balkanization of the profession [is] inconsistent with the recognition of an increasingly universal medical science". King, *In Search of a Standard of Care for the Medical Profession: The "Accepted Practice" Formula,* 28 Vand L Rev 1213, 1239 (1975).

It has also been cogently argued:

"Rural and small-town doctors should not enjoy advantages not given by the law to any other class of rural and small-town tort defendants. When patients considering operations approach doctors in Raymond, the doctors do not admit that they can be a little more careless and act with less responsibility than can doctors in Olympia, who can be a little more negligent than doctors in Tacoma, who can be a little more negligent than doctors in Seattle, who can be considerably more negligent than the doctors in New York City. Certainly, if doctors should freely indicate such discrepancies in medical practice, it would not be surprising that there would be a decrease in the number of opera-

---

[15] "Negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence." *Pederson v Dumouchel,* 72 Wash 2d 73, 78; 431 P2d 973, 977 (1967).

[16] The so-called "conspiracy of silence," referring to the reluctance of many physicians to testify against their fellow practitioners, is especially difficult to crack where the witness must be sought from the same area in which defendant practices. *See* Note, *Law and Medicine—Locality and the Standard of Care of Medical Practitioners,* 25 Ark L Rev 169, 173, fns 25–28 (1971); Prosser, p 164, fn 60.

tions in Tacoma and Olympia—and a greater decrease still in the Raymond area." *Douglas v Bussabarger,* 73 Wash 2d 476, 490; 438 P2d 829, 838 (1968).

Like the Iowa court which took a more understanding approach almost 100 years ago, "we recognize the fact that this standard [of care] must be a practical and attainable one, and not one of mere theory or fancied perfection, the enforcement of which would cause much litigation, and necessarily drive from the profession a large portion of those from whose practice the largest measure of practical good is attained". *Smothers v Hanks,* 34 Iowa 286, 290 (1872).[17]

This brings us to the formulation of a desirable rule. We think that the approaches of the Washington, Massachusetts and Kentucky Supreme Courts suggest the most viable alternatives, insofar as they permit cognizance of the purposes of the locality rule, as well as a recognition of the tradition that, by and large, physicians, because of their special knowledge, set their own standard of care. Further, while ensuring adherence to social responsibility, we do not wish to make it impossible to attract physicians to what may be less desirable centers of practice, those rural areas to which the old locality rule was properly directed. *Pederson v Dumouchel,* 72 Wash 2d 73; 431 P2d 973 (1967); *Brune v Belinkoff,* 354 Mass 102, 108–109; 235 NE2d 793, 798 (1968); *Blair v Eblen,* 461 SW2d 370, 373 (Ky, 1970).

---

[17] "[H]owever remarkable the advances made by medical science, there remains much to be learned; and members of the medical profession cannot be held responsible for circumstances beyond their knowledge and ability as human beings to anticipate and prevent. Accordingly, the law wisely requires of them only that they possess and use the reasonable knowledge, ability and skill of their colleagues." *Douglas v Bussabarger, supra,* 438 P2d 852, quoting *Hall v United States,* 136 F Supp 187, 199 (DDC, 1955) (Rosellini, J., dissenting).

We find, therefore, that the appropriate test is that a general practitioner is under a duty to use that degree of care and skill which is expected of a reasonably competent practioner of the same class, acting under the same or similar circumstances.

Factors to consider in construing the circumstances may include:

## (A) State of the Art

Certainly, a different standard may be required for dealing with an esoteric condition known only to a few experts or requiring sophisticated, costly and rare equipment to diagnose and treat, from that for treating a simple fracture for instance.[18] It may well be unrealistic to require a general practitioner to recognize a rare condition hitherto seen by only a small number of experts in the whole world, but it may be equally unrealistic to permit a local physician to continue prescribing medication or procedures which have been long since contraindicated for a particular condition.

Consideration of this factor permits both parties to present evidence indicating whether defendant physician should have been expected to diagnose and/or treat the patient differently, based primarily on the general state of knowledge of the subject condition within the medical community of general practitioners as a whole.

## (B) Consultation with Specialist

While it is possibly asking too much of the general practitioner in a less medically favored locality to be able to render the same quality of services that a specialist or a general practitioner

---

[18] See text, supra, 615.

in a more medically favored area would be capable of, it may nonetheless be reasonable to expect him or her to recognize when a medical problem requires the aid of a specialist or a general practitioner with more experience or training.

Parties in a malpractice case may therefore present evidence indicating whether or not the defendant physician should reasonably have recognized that the medical problem presented required the diagnosis or treatment of a specialist or at least a physician with more training or skill than the defendant. Unreasonable failure to do so could be found to constitute negligence.

## (C) Local Practice

Defendant is permitted to come forward with proof of local factors which would warrant deviation from a general or national norm. 43 Miss L J 592, fn 30; Note, *Torts—Medical Malpractice—Rejection of "Locality" Rule,* 46 NC L Rev 680, 686 (1968). This may include such factors as lack of facilities and specialists, nonaccessibility and distance of facilities and specialists, and the unique character of the medical condition in relation to the experience of the community. It is likely, for example, that locality will tend to have little relevance if the question is whether a physician should have known something, but may be significant if the alleged malpractice involves failure to give unusual, sophisticated treatment available in only a few medical centers in the world.

Consistent with this, the locality, however, should not be the geographical boundaries of the particular community, but should be defined as "an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the

patient". *Pederson v Dumouchel, supra,* 72 Wash 2d 79; 431 P2d 978. For purposes of determining the competence of experts to testify, if factors warranting such deviation from the general norm are demonstrated, then the expert should be familiar with practice in similar communities so defined.

For purposes of determining the ultimate question of the appropriate standard of care, the jury should be instructed that the standard of care in these medically similar localities is but *"one* circumstance in determining the skill and care required". *Brune v Belinkoff, supra,* 354 Mass 109; 235 NE2d 793, 798.

In this way, an unreasonable standard is not imposed upon the most isolated physician, and unique characteristics of the community will be taken into account, while, at the same time, answering the primary well-founded objections to the old locality rule. The pool of possible witnesses will not be unrealistically limited, and those physicians giving substandard care will not be permitted to shield themselves behind geographical boundaries.

This rule, while perhaps shifting the emphasis, is in the spirit of, and not inconsistent with, the Michigan precedents hereinabove discussed.

## VI—APPLICATION TO THE PRESENT CASE

Although this rule concerning the standard of care is intended to be prospective only, and thus not applicable to the case at bar, we include examples as to the appropriate means of applying the test in order to provide guidance to the profession.

The physicians involved in the case at bar are themselves examples of the high level of education

and cross-fertilization now typical of the profession. Dr. Barrios, a native of Peru, attended premedical and medical school in Lima, Peru, where he also was a resident in pulmonary diseases. He came to the United States to participate in a rotating internship in Sioux Falls, South Dakota. Subsequently, except for a brief period during which he returned to Peru, he was a resident physician at Mayberry Sanitarium in Northville, Michigan (including one period when he was assigned to the Children's Unit), was a resident surgeon at Alexander Blain Hospital in Detroit, and was the physician in charge of the Student Health Service at Michigan Technological University in Houghton before opening his own office in Hancock in 1965. He is a member of the staff of St. Joseph's Hospital in Hancock, a member of the local medical society, and is licensed to practice in Michigan.

Dr. Barrios is associated in the same office with Dr. Pedro Ruiz De Castilla, also a Peruvian native who attended school in Lima, Peru. Dr. De Castilla was an intern in St. Mary's Hospital, Knoxville, Tennessee, and held residencies in pathology in Baptist Hospital, Nashville, Tennessee, in general surgery at Harper Hospital, Detroit, and in pediatric surgery at Children's Hospital, Detroit, before joining Dr. Barrios. In Dr. De Castilla's application for appointment to the medical staff of St. Joseph's Hospital, he requested privileges in general practice and general surgery, and noted a specialty in pediatric surgery. Dr. Barrios and Dr. De Castilla often consulted together.

Even the nurses at St. Joseph's Hospital are part of this ecumenism, as they are trained in the use of the Isolette at Children's Hospital in Detroit.

The entire active Medical Staff of St. Joseph's Hospital, apparently including those who do not hail from the Houghton-Hancock neighborhood, participate in evaluating the clinical practice in the hospital. Such is required for accredited hospitals by the Commissioners of the Joint Commission on Accreditation of Hospitals. Members of the General Practice Department should have privileges in the clinical services of the other departments of the hospital. Additionally, medical staff meetings of the hospital are held regularly.

While none of these factors is alone dispositive, they do indicate that the bucolic picture of the lone general practitioner, isolated in a small village, remote from contact with other general practitioners and specialists, and shut off from the progress of modern medicine, is neither accurate nor appropriate. In the case at bar, when Dr. Barrios ultimately recognized he had a problem with the Siirila infant, he had ready access to a specialist, who himself had similar access to a specialist. This was in addition to the specialist in his own office.

## (A) State of the Art

We note that there is evidence offered indicating familiarity of the medical community with oxygen dosage and RLF. Furthermore there was evidence that knowledge of RLF and the proper oxygen treatment to avoid it was common and widespread in the medical profession. Defendant might offer evidence that such information was in fact not generally known by other general practitioners. While defendant might testify that he did not know as evidence of the state of the art, that is not conclusive, inasmuch as he might well be required to have known because of the general state of the

art. Defendant cannot alone define the state of the art by his knowledge, or lack of it, when that index will eventually be used to determine whether he was in fact negligent.

## (B) Consultation with Specialist

Testimony that James Scott Siirila was born three-and-one-half months prematurely and at 2 pounds, 1 ounce, was the smallest baby ever born in the area would certainly be in order to raise the question whether a general practitioner in the Hancock area should not have immediately consulted with a specialist.[19] Likewise it would appear that testimony that the smaller the baby the more likelihood of RLF would be appropriate.

Defendant would, of course, be entitled to produce testimony that in his area such circumstances would not reasonably suggest consultation with a specialist, and the jury would have to decide the question. Defendant could also, of course, recognize that the degree of prematurity and the smallness of the baby required special handling but that such handling was within his capabilities. This would naturally subject his actions to being judged by a higher standard of care.

## (C) Local Practice

Defendant presented extensive evidence concerning the difficulty of transporting an infant to Marquette, which, insofar as it depicts the difficulty perhaps of obtaining treatment, indicates particular factors which the jury might accept as making the Houghton-Hancock area unique and thus precluding application of a broader standard.

---

[19] Of every 100 babies born weighing less than 1,000 grams, 90 babies do not survive. James Scott Siirila weighed 950 grams.

Evidence that because of factors unique to Houghton-Hancock physicians in that area did not consider the possibility of RLF when prescribing oxygen therapy is also pertinent.

Plaintiff, of course, might present evidence to rebut such contentions.

The above are not the only factors which may be presented as to standard of care, but they suggest the appropriate means by which it may be established.

## VII—Conclusion

The rule decreeing that the standard of care of general practitioners is determined by reference to the standard in the same or similar communities has long been accepted by bench and bar. Therefore, rather than apply the new rule of law to the case at bar, we would apply it to all cases tried after the date this opinion issues. "A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward." *Great Northern R Co v Sunburst Oil & Refining Co,* 287 US 358, 364; 53 S Ct 145; 77 L Ed 360 (1932).

We would hold that the test in Michigan henceforth shall be that a general practitioner is under duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class, acting under the same or similar circumstances, having in mind (a) the state of the art for the particular medical situation, (b) whether a specialist should reasonably have been consulted and (c) such local factors as might be pertinent.

We would therefore affirm the trial court.

Levin, J., concurred with Williams, J.